## Fisher *v.* State.*

(En Banc.   April 23, 1928.)

[116 So. 746.   No. 26938.]

208

---

*Corpus Juris-Cyc. References: Criminal Law, 16CJ, p. 564, n. 48; p. 565, n. 58, 59, 63, 64; p. 717, n. 39; p. 734, n. 8; p. 929, n. 86; p. 1010, n. 14; p. 1035, n. 54; 17CJ, p. 73, n. 80; p. 77, n. 34; Homicide, 29CJ, p. 1073, n. 59; 30CJ, p. 187, n. 41; p. 204 n. 84; p. 395, n. 14; On sufficiency of circumstantial evidence to prove corpus delicti in homicide, see annotation in 68 L. R. A. 75; 7 L. R. A. (N. S.) 181; 7 R. C. L. 776; 2 R. C. L. Supp. 446; 4 R. C. L. Supp. 498. As to admissibility of evidence of trailing of persons by bloodhounds, see annotation in 42 L. R. A. 432; 35 L. R. A. (N. S.) 870; L. R. A. 1917F, 730; 8 R. C. L. 784; 7 R. C. L. Supp. 263.

*Greek P. Rice, Jr.*, and *Vincent J. Brocato, Jr.*, for appellant.

*Rufus Creekmore,* Assistant Attorney-General, for appellee.

ETHRIDGE, J. John Fisher, the appellant, Rayford Leonard, Lindsey Coleman and Albert Hobbs, all negroes, were indicted for the murder of one Grover C. Nicholas in the circuit court of Coahoma county, Miss. The case was here on a former appeal from a conviction, and is

reported in 145 Miss. 116, 110 So. 361, wherein the case then before the court is fully stated, and the judgment was reversed for the admission of certain confessions alleged to have been extorted from the defendant and his coindictees by unlawful methods.

When the case was remanded to the circuit court of Coahoma county, a motion for a change of venue was filed. The motion was granted, and the case was sent to Yazoo county for trial. The appellant was put on trial in Yazoo county at the April, 1927, term, the result of which was a mistrial. At the next term, the October, 1927, term, the appellant was again placed on trial, was found guilty as charged, and was sentenced to suffer death.

In the present trial, the confessions extorted by unlawful methods were not offered in evidence by the state, but a confession alleged to have been made by the appellant to a fellow prisoner the day he was placed in prison and before the coercing method was resorted to was introduced by the state. In this alleged confession to the other prisoner, as testified to by said prisoner, the appellant stated that he was arrested on a charge of killing a white man, but that he was not guilty; that the right man had been arrested, but that he had been turned loose. He was asked how he knew the other party was the right man, to which he replied that he was present at, but had nothing to do with, the killing.

Albert Hobbs was introduced as a witness for the state on the last trial, and testified that he lived with Mollie Berry, and was at home the night of the killing, reading his Bible, when some one came for him, and reported that one of the other negroes' car had stalled near the store where Nicholas was killed; that he went with him down to a gin, near the said store, and, seeing no car, asked where the car was; that the appellant and others were at the said place; that the appellant asked one of the other negroes to state to the witness what they intended to do, and that the designated party, in the presence of

appellant (Fisher), stated that they were going to rob the store and get some money; that the witness remonstrated with them, stating that he would have nothing to do with it, and that he would tell if they did it; and then, he said, some one stated that they would give him part of the money, but that he still refused; and that one of the other negroes struck him with his fist, and stuck a pistol in his face, and he told them, if they would not shoot him, he would go with them; that they said they would take him down to the store with them; that if he told, he would have been at the killing, and "in it" with the rest of them; that Fisher went along; that the witness was placed on the gallery of the store to watch the road; that one of the other indicted persons stood near with a pistol; that he (the witness) planned to raise an alarm by saying that a car was coming, and make his getaway; that the party who had the pistol turned to go into the store, and he, the witness, stepped off into the darkness and ran away, intending to go home; that he heard a noise like a chair or box turning over; that in about an hour all of the parties, except Fisher, returned to the house of Mollie Berry (Fisher lived in a house in Mollie Berry's yard); that witness did not see the killing, but heard of it the next day.

Hobbs further stated that he had testified, on previous trials, that he knew nothing of the killing, and that the water cure had been administered to him and others; that he had testified to like effect on the trials of some of the other defendants. He testified that such testimony was false, but that he was in prison, and thought they were going to hang him anyway; that the day following the killing attorneys approached him, and, when he started to make this statement, said it was a lie, and that he would break his own neck. As to this statement, he was contradicted by the attorneys referred to. Witness took the stand, and stated that, after being in jail, he went through a fast; that he decided that he was going to die anyway;

and that he would rather die with the truth than to die with a lie.

After the body of Nicholas was discovered the next morning, unconscious, but still alive, bloodhounds were sent for, and, upon arrival of the hounds with their owner, they were taken by him to the store, and into the store where the body lay, and there, the witness Traynham said, the dogs smelled of the deceased and himself, in turn; that they were taken to the cash drawer in the store, and that there they took a trail, and followed. it to the house in which appellant lived, where he was found alone and taken into custody.

The defendant took the stand in his own behalf. He denied the statement of Hobbs, and of the witness Jones, who was in prison, and who testified as to the alleged confession. Defendant denied that he was at the store on the occasion at all; denied that he had been at the store for about a week prior to the killing; testified that the night on which the killing occurred it was rainy; that early in the night he had gone to another place, and had remained there until seven or eight o'clock; that he then went to his room, and remained there the rest of the night. The party to whose house he claimed to have gone on the night of the killing testified to like effect—that defendant left his house about eight o'clock on the night of the killing.

The state introduced evidence of the condition of the body of the deceased; that he had been struck above and behind the ear with a blunt instrument; that, when found, he was unconscious and bleeding; that his hands were tied behind his back, and his limbs tied together with a rope, or cord. Witnesses testified that the lock on the safe in the store was battered; that a hammer was found by the stove in the store, and that a piece of iron was found behind the counter; that an axe found in the store had blood upon it; and that the combination dial on the safe had been battered. The introduction of this evi-

dence as to the physical conditions surrounding the deceased was objected to, and the objection overruled, but no exception was taken thereto. The introduction of such evidence constitutes the first assignment of error.

The case depends, in part, upon circumstantial evidence, and the *corpus delicti* may be established by circumstantial evidence.

We think the evidence as to the situation of the body of the deceased, its condition at the time it was discovered, and the location and condition of these instruments, was admissible for the purpose of showing that the killing was done by criminal agency, and that there was no error committed in admitting it. It is true that the physical conditions surrounding the deceased did not, of themselves, connect the appellant with the killing; but they show the criminal agency of a human being, other than Nicholas, in bringing about his death.

During the examination of the witness Traynham, the appellant asked the witness what was the present *status* of the home of Mollie Berry. This question was objected to, and the objection sustained. No explanation was made of the materiality or pertinency of the then condition of the home of Mollie Berry to the question involved; the trial being held two years subsequent to the time of the killing. We think the court committed no error in sustaining the objection.

It is next assigned for error that the court erred in permitting the witness Gant to testify with reference to the action of the bloodhounds before laying the proper legal predicate therefor. Gant was asked, first, as to the quality, breeding, and training of his bloodhounds. He stated that he trained the dogs; that they were of pure blood and breeding; that they were Red English bloodhounds; that their most prominent ancestor was Black Prince, of New York; that he personally trained the dogs by putting out a person and running him with the bloodhounds, by having the tracks of such person crossed by

other persons to see if the dogs would leave the trail of the person they were first put upon and take up the trail of such other parties—that he would have a try out of the dogs. He testified that he had never known the dogs to leave the first trail to follow the trail of those crossing the first trail.

Gant testified that he reached the place of the killing about nine o'clock on the night following the discovery of Nicholas' body in the store; that the weather was damp; that it was in the fall of the year; that he went into the store and looked around, to get a starting point; that he took the dogs, and put them down by the safe; that they left from the safe, going out of the store and off of the end of the store gallery; that, when they struck a trail, they began to bay, which was the custom of the dogs. He further testified that these dogs were trained to run human beings, and nothing else; that they were not permitted to run any sort of animal. Gant testified that, when the dogs came out of the front door of the store, they jumped off of the end of the gallery and trailed up to, and down, the railroad to a path that went out to a negro house, followed the path up to the house, and bayed; that he knocked on the door of the house, and asked who was there, and a negro came to the door, and the dogs made at him, baying and jumping at him; that this was the party whom the dogs had trailed. He further testified that he circled the house to see if any other tracks had been made around the house, but that the dogs refused to take up any trail leaving the house; that the defendant was then arrested by the deputy sheriff who accompanied him on the trail.

It seems to have been the theory of the appellant that it was not permissible to prove the breed of the dogs *viva voce* by the testimony of Gant, but that it should be done by written pedigree. We think it was competent to prove the breeding and training of the dogs by the oral testimony of their owner. Counsel have cited

no authority which holds that a written pedigree is necessary, and we know of no statute making it competent or exclusive evidence. We think it was competent to prove their training, breeding, and capacity by the method used in the present case.

It is argued that Gant could not have known upon whose trail he was placing the bloodhounds, for he did not know that he put them on anybody's trail. In the very nature of things, of course, Gant could not have known whose trail the dogs took, under the circumstances disclosed in the record. None of the state's witnesses, other than Hobbs, knew that the appellant was at the store on the occasion of the homicide. It was competent to show that the dogs took the trail of some person at the place where Nicholas' body was found, as the public had been excluded therefrom until the arrival of the bloodhounds. Following this trail from the store to the house in which appellant lived tended to prove that he had recently been at the place of the homicide. It is an established law of the state that evidence of bloodhounds trailing a track from the scene of the homicide to the place where a person is found is admissible, where the evidence shows that the dogs were of the proper pedigree and breed, and that they had been properly trained and were reliable on trailing such tracks. *Spears* v. *State,* 92 Miss. 613, 46 So. 166, 16 L. R. A. (N. S.) 285; *Carter* v. *State,* 106 Miss. 507, 64 So. 215, 50 L. R. A. (N. S.) 1112; *Scott* v. *State,* 108 Miss. 464, 66 So. 973; *Harris* v. *State,* 143 Miss. 102, 108 So. 446. In this last case it was held that "although fact that bloodhounds trailed defendant from track at place where person committed crime must have stood is circumstance indicating crime was probably committed by defendant, such evidence is admissible only after preliminary proof that bloodhounds were pure bred, and trained to track human beings, and were reliable and that track where bloodhounds started was made by person committing crime. That case was

reversed because the necessary proof as to the training and breed of the dogs was not made. But it is fully established by the authorities cited that, where such evidence of breeding and training and faithfulness to trail is proven, such evidence is admissible as a circumstance pertinent, with other evidence, to prove the guilt of the person so trailed; and we think the record in this case meets the requirements in the above-stated case. These requirements are made in favor of life, liberty, and the pursuit of happiness by man; but, when the necessary safeguards are provided, the evidence is admissible.

Counsel contends that such testimony has a telling effect on the jury; that jurors are apt to put too much faith in, and attach too great significance to, its inception and import. While it is not looked upon with favor in law, still it may be admitted in evidence, and, when so admitted, its weight and worth is for the jury.

Conviction of the appellant did not depend alone upon the fact that he was trailed with bloodhounds, but that evidence is supported by the testimony of Hobbs and of Jones. Hobbs testified as to the presence of the defendant at the store at the time of the homicide; and Jones testified that appellant voluntarily confessed to him that he was present on that occasion. Under the evidence, the appellant and others had agreed to go to the store on the night in question for the purpose of committing a robbery, and the killing was done in pursuance of the robbery, which made all persons in the common conspiracy guilty regardless of which one of the conspirators actually committed the killing. At the time appellant made the statement to Jones, he was, no doubt, ignorant of the law on this subject, and did not think he would be found guilty, unless he personally committed the crime.

It is next contended that the court erred in refusing to permit the appellant to cross-examine R. E. Frazier as to his testimony given on a previous trial. The only

showing in the record on this proposition is the following:

"Q. This is the first time you have testified in these cases, isn't it? A. No, sir.

"Q. What other cases have you testified in? A. I testified here at the last court.

"Q. You didn't testify in any of the cases that were tried at Clarksdale?" (Objected to. No ruling or exception. Witness excused.)

This was certainly not reversible error, as counsel did not insist on a ruling and took no exception.

It is next contended that it was error to admit the testimony of Marshal Jones, the fellow prisoner. The record shows that the statement was voluntarily made; that no inducement was offered or used to obtain it. It was made to a fellow prisoner who asked, as a mere matter of curiosity, why the appellant was in jail; and it was admissible for the purpose of showing that the appellant was present at the scene of the homicide, at the very time the killing was done. It tended to show his connection with the crime. It is contended, in connection therewith, that the night prior to the time he was placed in jail some one struck him while he was under arrest; but there was no effort to show that this blow was inflicted for the purpose of obtaining a confession, or that any statement was made by the appellant under the influence of it. Appellant denied the statement testified to by Jones as to his saying he was present, but did not offer any evidence when the admissibility of Jones' testimony was under consideration. He reserved the denial thereof until he took the stand in his own defense at the conclusion of the state's evidence.

There is nothing in the record to show that the refusal of the court to permit him to testify as to the blow he was struck the night before he was placed in jail was erroneous. The pertinency of this testimony is not apparent in the light of this record, however important it

may have been on the former trial, where unlawful testimony was introduced.

It is also assigned as error that the court refused to permit the appellant to show the present whereabouts of the coindictee, one Lindsey Coleman. It appears from the record of a former trial that Coleman was tried and acquitted, and was lynched immediately after his acquittal. The appellant, in asking the question, did not indicate to the court any pertinent purpose for introducing this evidence on the present trial; and, on the record, the court properly excluded the evidence. If the appellant had stated that his purpose was to show his inability to produce Coleman, and to prove that Coleman was dead, the court might have admitted that evidence for the benefit of the jury; but the fact that Coleman was lynched, at Clarksdale, more than a year prior to the trial in Yazoo county, Miss., was not, as we see it, pertinent to the case.

It is next assigned as error that the court granted the state's instructions 2 and 3, which, it is claimed, are erroneous, and calculated to mislead the jury.

Instruction No. 2 told the jury that, if they believed beyond a reasonable doubt that John Fisher, together with Rayford Leonard, Lindsey Coleman, and others, entered into an agreement to rob the store of Mr. Traynham, and, pursuant to such agreement, attempted to do so, and in such attempt any one of them struck Grover Nicholas on the head, from which blow he afterwards died, then the jury should find the defendant guilty as charged; that it was immaterial which one struck the blow, and was immaterial whether or not there was an actual intent to kill. Under the proof of conspiracy, above set out, and the circumstances developed in the evidence, we think the instruction was proper, and that there was no error committed in granting it.

Instruction No. 3 for the state told the jury that "murder is the killing of a human being without authority of

law by any man or in any manner when done with the deliberate design to effect the death of the person killed;'' and the court charged the jury that, if they believed from the evidence beyond a reasonable doubt, that John Fisher, in connection with others, went to the store of Mr. Traynham, with the intent and design to rob the store, and that, in the attempt to rob the store, John Fisher, or another, struck the blow from which Grover Nicholas afterwards died, then it was the duty of the jury to find the defendant guilty as charged; that it was immaterial whether or not John Fisher actually struck the blow, or blows, or whether it was struck by others. It is the settled law of the state that the act of one conspirator done in the carrying out of the conspiracy is the act of all of the conspirators, and this instruction is not erroneous.

The appellant contends that the court erred in refusing instruction No. 5 for the defendant. Instruction No. 5, refused the defendant, reads as follows:

''The court instructs the jury that the state, in order to make out its case by circumstantial evidence, such evidence must exclude any and every other reasonable hypothesis than that of guilt deducible either from evidence or lack of evidence.''

Instruction No. 9, given for the defendant, embraces this principle. The instruction reads as follows:

''The court instructs the jury that, if they can deduce from the facts and circumstances surrounding the case, either from the evidence or lack of evidence, any reasonable hypothesis consistent with the innocence of the defendant, then there is a reasonable doubt of his guilt, and the jury must return a verdict of not guilty.''

The court is only required to charge the jury, in stating a given principle, one time and no more.

Counsel also complains of the refusal of instruction No. 7, requested by the defendant, which reads as follows:

"The court instructs the jury that, to warrant a conviction in this case, the evidence on the part of the state, on the whole, must be such as to produce a moral certainty of guilt to the exclusion of every reasonable doubt of the guilt of the defendant, and, unless the evidence has this effect, the jury must acquit."

This principle was, in substance, given in other instructions.

Counsel also complains of the following instruction, which was refused:

"The court instructs the jury for the defendant that, if there arises from the facts in this case two reasonable theories by one of which the jury should, under the instructions of the court, find the defendant guilty, and under the other, it would be the duty to find the defendant not guilty as charged, then it is the duty of the jury throughout to give the defendant the benefit of every reasonable doubt in the cause, and to adopt that theory consistent with the innocence of the defendant, even though the jury believe from the evidence that the theory of his guilt is the better, and supported by the stronger evidence."

In support of this contention *Thompson* v. *State,* 83 Miss. 287, 35 So. 689, is cited. This instruction has been condemned a number of times by this court. *Runnels* v. *State,* 96 Miss. 92, 50 So. 499; *Roux* v. *City of Gulfport,* 97 Miss. 559, 52 So. 485; *Saucier* v. *State,* 102 Miss. 647, 59 So. 858, Ann. Cas. 1915A, 1044; *Brady* v. *State,* 128 Miss. 575, 91 So. 277; *Wiley* v. *State,* 129 Miss. 196, 91 So. 906.

The principle sought to be invoked in this instruction was never applicable to testimony, except that of circumstantial evidence alone, and was improperly applied in *Thompson* v. *State,* 83 Miss. 287, 35 So. 689, to the testimony of eyewitnesses; and, as stated above, has since been disapproved many times. Its effect has been to mislead the jury and to prevent it from exercising its

discretion in settling questions of veracity under proper instructions by the court.

We find no other question calling for discussion, and the judgment of conviction is affirmed, and Thursday, the 31st day of May, 1928, fixed as the day of his execution.

*Affirmed.*