# YARBROUGH *v.* STATE.

(Division A.   November 10, 1947.)

[32 So. (2d) 436.   No. 36565.]

**Deavours & Hilbun,** of Laurel, for appellant.

**Greek L. Rice**, Attorney General, by **Geo. H. Ethridge**, Assistant Attorney, for appellee.

**Roberds, J.,** delivered the opinion of the court.

The jury convicted Yarbrough of the rape of Billie Wee Ponder, a Negro girl, five years and two months old, and sentenced him to the state penitentiary for life. He appeals.

He first contends that the evidence of his guilt is not sufficient to support the verdict of the jury. This neces-. sitates a review of the evidence.

The father of the child is a minister, has a wife and eight children and lives in the southern part of Laurel, Mississippi, in a section known as Queenstown, largely inhabited by members of the Negro race. On the evening of December 6, 1946, about sundown or a little later, the mother sent Billie Wee on an errand to a nearby shop. Some time having elapsed without her return, the parents instituted a general search for her. While the search was in progress and near the hour of seven o'clock the child appeared at the back of her home, emerging from a wooded area. She was crying and excited. She told her parents a white man carried her into the woods and attacked her, and tried to show the place of the attack in the woods. She was examined by a local doctor, whose qualifications were admitted, about 10:30 that night. He testified she was very much excited and had "blood on both lower legs, both lower extremities, and on the abdomen"; that the blood was coming from the vagina and rectum. He said: "On examination of these parts, the seal of the virtue, known as the hymen, was torn, mutilated, stretched far beyond the elasticity of the vaginal orifice, or opening." He explained that the hymen, in medical terms, means the maidenhead in layman understanding. He further testified: "On examination of the rectum, I found the opening was torn and mutilated. It looked as if this cavity had been stretched beyond its normal boundary. Further examination of the parts was not advisable, in view of the extreme pain and bleeding." He said she was bleeding "profusely" from the vagina and rectum. The child was in bed and under the care of this doctor for three weeks.

Yarbrough first appears in the Queenstown neighborhood about 5:40 that evening. He was at the store of F. A. Hendry to get a check, the property of another, which was in the possession of Hendry. Yarbrough had an order for the check and obtained its possession. He was drinking. Hendry's store was about two-thirds of a block from the Ponder home. Mr. Luther Hill next saw Yar-

brough in the same neighborhood between sundown and dark, walking towards the Ponder home. Two boys, eleven and twelve years of age, playing marbles near the walkway, saw him pass, leading the child by the hand. These boys knew her well. They lived within a few yards of her. As Yarbrough approached the woods, he picked her up and went into the woods with her. One of the boys said he started running as he entered the woods.

The child testified. We will discuss the competency of her evidence later. She said, in the absence of the jury, that Yarbrough carried her into the woods, laid her down, got on top of her and hurt her and caused her to bleed. She pointed out Yarbrough as the man. In the presence of the jury, she testified that Yarbrough carried her into the woods, laid her down, got on top of her, and she identified and pointed out Yarbrough in the courtroom.

We next find Yarbrough at the cafe of Mrs. Nell Tibbs, some three blocks from the Ponder home. She testified this was between six and seven o'clock, perhaps after 6:30. She described his condition in these words: "Well, he was so bloody and his hands were dirty and bloody looking, and his face was dirty, and his hair all pushed up, so I just wouldn't serve him anything. I asked him to get out." Two taxi drivers saw him between 7:30 and 8:30 and said there was blood on his hands and clothes. He was going from place to place trying to get the check cashed. Finally, some time between nine and ten o'clock, after he had cashed the check, he was driven in a taxi to a cafe being operated by Mrs. Edna Bishop on Highway 11, about a mile and a half north of Laurel. The taxi driver testified that as Yarbrough entered his taxi, he saw signs indicating Yarbrough had just bathed his hands and face. The crime had been reported to the officers. The two boys had given them a description of the man who had carried the child into the woods, dressed, as they said, in khaki clothes, and the officers had learned from the various persons who subsequently saw him that Yarbrough was so dressed and was in the vicinity of the crime

about the time it was committed. They had also gotten information he was at the Bishop Cafe. They went to that cafe about 10:30. Yarbrough was there. He was sitting at the eating counter, with his hat pulled over his face. On recognizing the officers, he tried to climb over the counter and run away. They caught him by the ankle and pulled him back. One of the officers testified: ''As we come out he made the statement that he already had his route picked out; if he had seen us in time we wouldn't have got him whenever he went out at the back.'' At police headquarters his clothes were removed. The pants had blood in front where they open. His shirt was torn and had blood ''on the front and around the tail.'' His shorts had blood ''on the front part.'' The officers swore they knew from observation that it was blood, but the chief of police took the precaution to have a chemical analysis made, which showed it to be human blood. The garments were introduced in evidence. The two marble-playing boys were brought to the city hall that night, and immediately identified Yarbrough as the man who was leading the child. They pointed him out among a number of persons present, one of the others being also dressed in khaki.

Yarbrough testified. He said he went to the South Side Inn in Laurel around eleven to twelve o'clock that day; was drinking considerably and remained there until five or five thirty that evening. He admitted being at Hendry's getting the check, seeing Mr. Luther Hill, and being at the store of Mrs. Tibbs. He took himself from the Queenstown neighborhood by saying that after he left Mrs. Tibbs two colored boys carried him into the city. He did not give their names nor say how they carried him. However, it is noted that he does not claim to have left the neighborhood until after he visited the Tibbs Store, when, according to her testimony, his hands, face and clothing were bloody and dirty. The great condemning fact was the blood upon his hands and clothing. Yarbrough, like Macbeth, might well have asked ''Will

all great Neptune's ocean wash this blood from my
hand?'', and exclaimed

"I am in blood

"Stepp'd in so far that, should I wade no more,

"Returning were as tedious as go o'er."

He tried to explain it away. He denied that he had
any blood upon his person or clothing when he was in
the Tibbs Cafe. He said Mrs. Tibbs was wrong about
that. He then said the blood was the result of a fight.
He said when he arrived at the Bishop Cafe that Mr.
Bishop, considering his conduct towards Mrs. Bishop
insulting, struck him in the face with his fist, knocking
him down, causing a split in his lip and his nose to bleed.
That was sometime between nine and ten o'clock. That,
of course, does not explain the blood which was upon
him before that time as given in the evidence of Mrs.
Tibbs and the taxi drivers. Nor could it have any bear-
ing upon the undisputed fact that when he thereafter
arrived at police headquarters there was blood upon the
tail of his shirt in front and upon the front opening of
his shorts. He also said that after he was struck by
Bishop, he went to the rear of the cafe and bathed his
hands and face. We might add that he undertook to
explain his efforts to flee upon approach of the officers by
saying he had heard the officers were looking for him but
understood it was in connection with his cashing of an-
other check, not with reference to the crime here involved.

He introduced some witnesses other than himself, who
told of his taxi-riding from place to place in an effort to
cash the check, and of his final success in cashing it, and
then his ride to the Bishop Cafe. These witnesses did not
help his cause because these events were all after the
crime was committed, and, as stated, two of them testi-
fied to seeing blood upon him, and the other said it ap-
peared that he had just bathed his hands and face. They,
of course, did not see his underwear.

Under these circumstances, it requires no discussion,
in our opinion, to demonstrate that the jury had ample

evidence to support its verdict. Such crimes are not committed in the open, and usually the victim is the only eye-witness. It is difficult to see how any reasonably intelligent, fair-minded, jury, seeking for the truth, could have returned any verdict other than guilty. This crime reached the depths of human depravity, and appellant may well be thankful that the jury did not sentence him to death.

Appellant says Billie Wee did not possess the capacity to testify as a witness, and that it was reversible error to permit her to do so. We have given the substance of her direct testimony. She was not cross-examined. As preliminary thereto, she said she attended Sunday School and when asked ''Where do little girls go that tell stories?'', she replied ''To the very bad man.'' She was then asked ''Where do little girls go who tell the truth?'' and she replied ''Goes to heaven.'' At the time she testified she had attained the age of five years and a little over four months. She was able to count to ten.

All that is necessary to qualify a child as a witness is that it possess the capacity to observe events and to recollect and communicate them, and have the ability to understand questions and to frame and make intelligent answers, with a consciousness of the duty to speak the truth. Jackson v. State, 158 Miss. 524, 130 So. 729. Tested by that rule, Billie Wee was a competent witness. The trial judge is in much better position than is this Court to say whether such witness is qualified. He hears and observes the witness, its manner and actions. After all, it is not so much a question of the competency of the witness as it is the weight and credibility of his evidence. The jurors, who also see and hear him, can usually be depended upon to judge the accuracy, credibility and weight of such evidence. The court did not err in admitting the testimony of Billie Wee Ponder.

Appellant complains of the six instructions granted the State. Four of these instructions told the jury that before they could convict defendant they must believe

from the evidence that he was guilty beyond every reasonable doubt. One instruction told the jury that all of the law for their guidance was contained in the instructions given the State and defendant, and that in reaching their verdict they should consider all of the instructions together. The other instruction told the jurors that before they could find defendant guilty that they must believe from the evidence, not only that he was guilty beyond a reasonable doubt, but that they must so believe to the exclusion of every other reasonable hypothesis. The complaint of appellant seems to be that each and every instruction granted the State should have, but did not, include the exclusion of every other reasonable hypothesis. Defendant himself obtained an instruction telling the jury ''Before you can convict the defendant in the case you must believe from the competent evidence introduced by the state that the defendant is guilty beyond all reasonable doubt, to a moral certainty and to the exclusion of every other reasonable hypothesis except that of guilt.'' We shall not burden this opinion with the citation of the numerous cases in this State laying down the rule that the instructions granted by the trial court should be by the jury considered as a whole, one as limiting or modifying or supplementing the other. Not only is this the rule laid down in the books, but in this case the State obtained an instruction expressly telling the jury to do that. It is not required that each instruction embody all of the law of the case. Indeed, it would happen more than not that this would be utterly impracticable, and, even if practicable, would be so lengthy and confusing—the jurors, instead of being helped, would be baffled thereby. The contention in this respect is without merit in this case.

Defendant requested and was refused what is generally known as the two-theory instruction. He urges, with force, that this was error. The uniform holding of this Court is that this instruction should not be given where the guilt does not rest entirely on circumstantial evi-

dence. Saucier v. State, 102 Miss. 647, 59 So. 858, Ann. Cas. 1915A, 1044; Brady v. State, 128 Miss. 575, 91 So. 277; Fisher v. State, 150 Miss. 206, 116 So. 746; Williams v. State, 163 Miss. 475, 142 So. 471; Micker v. State, 168 Miss. 692, 152 So. 286; Jones v. State, 183 Miss. 408, 184 So. 810; Holmes v. State (Miss.), 8 So. (2d) 453; Pettus v. State, 200 Miss. 397, 27 So. (2d) 536. It is the opinion of the writer that the instruction should not be given in purely circumstantial evidence cases, for the reasons, among others, (1) there are always two theories, that of the State of guilt and that of the defendant of innocence, in such cases, and the instruction, in effect, is a peremptory for the defendant; and (2d) because it places upon the trial judge the burden and danger of saying the cases is purely one of circumstantial evidence, whereas, in many cases, this as a very difficult question. However, we need not decide that question here. In the first place, we do not think that the guilt of defendant rests entirely upon circumstantial evidence, and in the second place the granted instructions required the jury, before they could convict, to believe him guilty beyond every reasonable doubt and to the exclusion of every other reasonable hypothesis. Those instructions embody the principle involved in the two theory instructions, and defendant got the full benefit of that principle. Runnels v. State, 96 Miss. 92, 50 So. 499; Wiley v. State, 129 Miss. 196, 91 So. 906.

Affirmed.