445 So.2d 815 (1984)
Ladd Herbert HOUSE, III, Appellant
v.
STATE of Mississippi, Appellee.
No. 54007.
Supreme Court of Mississippi.
January 25, 1984.
*817 Lisa P. Dodson, Hopkins, Logan & Vaughn, Gulfport, for appellant.
Bill Allain, Atty. Gen. by Frankie Walton White, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, C.J., and HAWKINS and ROBERTSON, JJ.
*816 ROBERTSON, Justice, for the Court:

I.
We today consider for the first time the use in aid of a criminal prosecution of testimony adduced through hypnosis. For the reasons described below, we hold that the hypnotist may not testify as to facts constituting the crime told him by the victim during a hypnotic session, nor may he offer an expert opinion that the victim is telling the truth. Because the hypnotically refreshed memory of the victim is susceptible of having been "contaminated" during the hypnotic session, her testimony becomes admissible only after certain safeguards set forth below have been complied with.
The Defendant has been indicted, tried and convicted of unnatural intercourse with M.P.[1], an eight-year-old girl, in violation of Miss. Code Ann. § 97-29-59 (1972). The offense allegedly occurred on January 26, 1981. In view of the disposition we make, no useful purpose would be served by recounting the details of the criminal act charged in this case. Suffice it to say that, for the reasons articulated below, we reverse and remand for a new trial.

*818 II.
A brief recitation of certain aspects of the trial proceedings will be helpful to provide the context for our consideration of the hypnosis-related issues presented in this case.
The Defendant has been convicted on the testimony of M.P., a young girl whose birthday is September 5, 1972. There is no independent, objective verification of the truth of the charges. The defendant has vehemently denied any form of sexual contact with M.P. In this context, the fact and opinion testimony of the hypnotist, Dr. Joseph Tramontana, most certainly weighed heavily in the jury's mind in favor of conviction.
Beyond that, the defendant is not the only person M.P. ever accused of forcing her to commit unnatural sex acts. M.P. has charged at least two other male persons with doing this sort of thing to her. M.P.'s mother testified that her daughter was three years old when she first made such accusations. On occasions prior to January 26, 1981, she had accused the defendant.
Moreover, there is the suggestion in the record that M.P. has been the object of a longstanding custody dispute between her mother and her grandparents. M.P.'s mother is the person who reported the instant offense to law enforcement authorities. The record suggests, however, that her motivation may not have been bringing the defendant to justice as much as it may have been to keep M.P.'s grandparents and the local welfare department from challenging the mother's fitness to maintain custody of M.P. and her brother.
We take a backseat to no one in our condemnation of the sort of crime here charged. It offends the sensibilities of decent people. Perpetrators should be vigorously prosecuted. Yet, because this sort of crime is so offensive and because of the other factors mentioned above, we are sensitive to the potential for a miscarriage of justice. This is particularly so where the testimony of the eight year old prosecutrix is arguably the product of a hypnotically refreshed memory corroborated only by the dubious  and inadmissible  hearsay and opinion testimony of a hypnotist.

III.

A.
Hypnosis has been around for a long time. Its use in judicial proceedings has been debated in other jurisdictions for nigh unto a century. See Ladd, Legal Aspects of Hypnotism, 11 Yale L.J. 173 (1902). Still, the matter has never been considered in the prior decisions of this Court.[2]
We are told that today hypnosis is a valuable aid to law enforcement. In that during a hypnotic experience many persons are capable of correct recall of the details of past events otherwise forgotten, law enforcement employs hypnosis in investigative work and now at trial. See Quarles, Hypnosis and the Law of Evidence: Testimony from the Hypnotically-Refreshed Memory, 51 Miss.L.J. 743 (1981). We further understand that hypnosis has potential as a tool of the defense in criminal cases, see Warriner, The Use of Hypnosis in the Defense of Criminal Cases, 27 Int'l Journ. of Cl. and Exp. Hypnosis, No. 4 at 417 (1979), although to our knowledge it has not been so used in this state.
This Court is committed to the proposition that all credible evidence that will assist the jury in its fact-finding task ought, if put in proper form, be admissible. Our prejudice favors inclusion, not exclusion, for we perceive such prejudice to be *819 consistent with the correct administration of justice in this state. We do not fear the new. That a newly developed type of evidence has never been used before in our courts hardly dictates exclusion.
On the other hand, our oaths require vigilance against forms of evidence infected with the potential for mischief and injustice. Even so, our prejudice favors admissibility under guidelines and safeguards realistically designed to ensure reliability. We eschew per se inadmissibility rules wherever possible. We bring this general frame of mind to our consideration of the use in this prosecution of evidence adduced via hypnosis.

B.
The questioned testimony produced by the hypnotic sessions between Dr. Joseph Tramontana, a clinical psychologist and hypnotist, must be divided into three separate categories:
(1) Dr. Tramontana's testimony wherein he stated to the jury facts surrounding the alleged offense told to him by M.P. during the hypnotic sessions;
(2) Dr. Tramontana's expert opinion testimony that M.P. was telling the truth about what the Defendant had done to her; and
(3) The post-hypnotic testimony of M.P. herself.

C.
At the outset, the State urges that we not consider any of the hypnosis issues in this case for procedural reasons. The State insists that these points were not properly preserved in the trial court by timely specific objections.
At trial defense counsel objected to the testimony of Dr. Tramontana on dual grounds: That he conducted his hypnotic session with M.P. without her mother's permission and, second, that he did not record the hypnotic session. The present grounds for objection and suggestion of error include, in addition, hearsay, improper bolstering of the prosecutrix' testimony, plus due process.
It is certainly true that this and every other appellate court we know anything about maintains and enforces a rule requiring that, before errors may be considered on appeal, generally they must be "preserved" at trial. See Stringer v. State, 279 So.2d 156, 157-159 (Miss. 1973). Generally, this means that the matter must be presented to the trial court in such a form that the trial judge has the opportunity to consider it with full knowledge of the respective contentions of the parties. On the other hand, where an objection is made and where the basis therefor is obvious from the context, little of value is accomplished by insistence upon a technically correct objection. See Loeffler v. State, 396 So.2d 18 (Miss. 1981). This is certainly true with so much of Dr. Tramontana's testimony as constitutes garden variety hearsay or improper blostering of the prosecutrix' testimony.
There are other important reasons why we reach the merits of the hypnosis issues here.
First, as explained above, the hypnosis-related evidence in this case is at the core of the trial. The justice of the proceedings below in a very real sense turns upon a correct treatment of the hypnosis-related issues.
Second, we are aware that hypnotic techniques are being used by law enforcement officials in this state and have been in such use for several years.[3] The Attorney General's office released an equivocal opinion on the subject on March 7, 1980. Both law enforcement and the bar need guidance from this Court on this subject. They need that guidance now.
Third, the law has been thoroughly briefed for our use and benefit in this case. Indeed, the briefs of counsel have cited to us practically every relevant legal and psychological authority on the subject. The *820 chances of our getting better briefs at a later date we regard as slim and none.[4]
Finally, fundamental rights in serious criminal cases rise above mere rules of procedure. Brooks v. State, 209 Miss. 150, 155, 46 So.2d 94, 97 (1950). We tend to disregard procedural niceties where such is necessary to avoid the possibility of a serious miscarriage of justice. See, e.g., Richardson v. State, 436 So.2d 790, 791 (Miss. 1983); Hooten v. State, 427 So.2d 1388, 1391 (Miss. 1983); Glover v. State, 419 So.2d 588 (Miss. 1982); Horton v. State, 408 So.2d 1197, 1200 (Miss. 1982); Loeffler v. State, 396 So.2d 18 (Miss. 1981).
Taken together, the objections actually made and our so-called plain error rule, see Rule 6(b), Miss. Supreme Court Rules, are sufficient to allow our consideration of the issues surrounding the testimony of Tramontana.

IV. The Hypnotist's Hearsay Testimony Regarding Facts Told Him
 
By The Victim
At trial, Dr. Joseph Tramontana was permitted to tell the jury factual matters related to him by M.P., the prosecuting witness. This testimony critically related to the facts of the crime with which defendant had been charged.
The context is important. Dr. Tramontana first testified that M.P. had seen him professionally five times in 1980, beginning in February, 1980. This was well prior to the January 26, 1981 incident that is the subject of this prosecution. This was also prior to the hypnotic session here in issue.
Dr. Tramontana testified that in February of 1980 M.P.'s mother brought her to his office and stated that the defendant had had sexual contact with M.P. Two months later both M.P. and her mother reported that these accusations had been the product of M.P.'s dreams, not actual experiences. Dr. Tramontana's testimony here was:
A On the second to the last of the, uh, of the five visits, the five times I had seen her, uh, the mother told me that, uh, that ... [M.P.] said all of her accusations had been a dream.
Q And what month was that?
A That was, that was April 8, 1980.
Q Okay.
A And I talked with ... [M.P.] and she agreed that it had all been a dream.
Again all of this occurred before January 26, 1981, and before Dr. Tramontana ever hypnotized M.P. It provides a necessary backdrop for understanding Dr. Tramontana's testimony regarding his professional relationship with M.P. after January 26, 1981.
On direct examination this colloquy took place between the state's attorney and Dr. Tramontana:
A February 17, 1981, we had an office visit at Gulf Coast Mental Health Center.
Q Okay. And did you see her [M.P.] after that day?
A March 9, 1981.
Q During that time, Doctor, that you saw her, on either of these occasions, did you, did you confer with ... [M.P.] regarding or had, well, let me ask you this:
Did you ever confer with her regarding any dreams in the past that she had stated to you?
A Yes, I did.
Q Okay. Would you relate that to us, please, sir?
A You want me to quote, uh, ... .
Q (Interposing) Yes, sir. How it came about?
A After ... [M.P.] had, uh, had told me that these things were true. That, uh, that they had been going on, uh, she was very tense, very, uh, had a great deal of anxiety symptoms.
* * * * * *

*821 At that time, I asked her [M.P.], uh, once she was in a [hypnotic] trance, why she had, uh, told me the year before that it was all a dream. And she said, quote, because ... [defendant] said for me to tell you that, close quotes.
And I asked her if she always did what he told her?
She said, quote, I was scared he was going to hurt me, close quotes.
And I said did he threaten you?
And she said, quote, no, but he seemed like he would hurt me, close quotes.
And then we went on into detail about what actually happened.
Q Okay. Did she relate these to you?
A Yes, she did.
Q Okay. In greater detail than in the past?
Yes, she did.
We have here Dr. Tramontana's testimony regarding a series of out-of-court statements of the prosecuting witness, M.P. Not only did Dr. Tramontana testify what M.P. told him, he also stated what M.P. said that the Defendant said to her. None of these statements attributed to M.P. was made under oath. None was subject to cross-examination, except in the sense that M.P. had appeared as a witness at trial in her own behalf.
The statements were introduced to prove the truth of the matters asserted. They are hearsay and are inadmissible unless they may be brought within some recognized exception to the hearsay rule. The state has called no exception to our attention, and none is apparent upon our independent reflection.
We do not regard this testimony by Dr. Tramontana as admissible under our rule allowing a physician to give the history related to him by a patient where the history was necessary to the treatment of the patient. The rationale for this exception to the hearsay rule is that a person's desire for proper diagnosis and treatment serves as an adequate assurance of the trustworthiness of statements made to a treating doctor. Barton, Cowart, The Enigma of Hearsay, 49 Miss.L.J. 31, 71 (1978). As a rule, we have left the admissibility vel non of such statements to the discretion of the trial judge. Gulf Oil Corp. v. Thatch, 240 Miss. 117, 125, 126 So.2d 501, 503 (1961). However, as here, the patient makes the statements while in a hypnotic trance the justification for the hearsay exception is rendered inapplicable in that the patient is not conscious of his own assertions.
In other jurisdictions, the testimony of psychologist hypnotists relating to what they have been told by the defendant about the crime has been rejected as hearsay and as improperly bolstering the testimony of a witness. See Rodriquez v. State, 327 So.2d 903 (Fla.App. 1976) (Court refused to allow expert called by the defense to testify as to statements made by the defendant while under hypnosis); State v. Conley, 6 Kan. App.2d 280, 627 P.2d 1174 (1981) (Defendant's expert could not testify as to statements the defendant made while under hypnosis which were offered to prove the truth of the matter asserted); State v. Harris, 241 Or. 224, 405 P.2d 492 (1965) (Doctor could not testify as to statements made to him by the defendant while under hypnosis or following hypnosis). See generally, Annotation, Admissibility of Hypnotic Evidence at Criminal Trial, 92 A.L.R.3d 442, 458-461 (1979). If a hypnotist may not testify as to facts told him by the defendant and thus bolster the defendant's testimony, surely it follows that such a witness may not relate out-of-court statements made by the prosecutrix.
We hold that the testimony at issue here was clearly inadmissible. While we recognize that the objection of defense counsel may have been technically deficient, we regard Dr. Tramontana's hearsay testimony as so prejudicial that, when considered together with the opinion evidence discussed below, reversal is required.

V. The Hypnotist's Opinion That The Prosecutrix was Telling The
 
Truth
At trial Dr. Tramontana was allowed to give his opinion that M.P. was telling the *822 truth. Indeed, Dr. Tramontana went further and, in the following colloquy, explained why he was convinced that M.P. was telling the truth.
Q Okay. Now, Doctor, did, uh, uh, at this time, after you got this, uh, this information from, from her, uh, did this confirm any of your beliefs regarding what she had told you in the past?
A Yes, it did.
Q And what was that?
A I believed her. I, uh, I believed her at first. I questioned when she said it was all a dream. I felt that possibly she was under some pressure, but there was nothing I could do about it, uh, if this was what everyone was saying.
When she told me the details, in March of this year, uh, the thing that impressed me the most was that she went into much more detail, not only as to what happened, but, but, uh, actually like she was reliving the incident. She talked about Mr. House, uh, continuing to look out of the window to see if mama was coming and these type of things, uh, which impressed me as being factual.
The objection to this testimony presented here is that a hypnotist's opinion that his subject is truthful does not qualify as an admissible expert opinion.
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.
We consider Dr. Tramontana's opinion as we would any other tendered by an expert. Is the field of expertise one in which it has been scientifically established that due investigation and study in conformity with techniques and practices generally accepted within the field will produce a valid opinion? Where the answer to this question is in the affirmative, we generally allow expert testimony. Indeed, within a wide range of contexts we have allowed expert opinion testimony from properly qualified psychiatrists and psychologists.
The opinion in issue here is a hypnotist's opinion that the prosecutrix is truthful in her version of what the defendant did to her on January 26, 1981. If the State could demonstrate that the science of hypnosis has become such that an expert in the field, upon proper study of the prosecutrix, could offer a demonstrably valid opinion as to the veracity of her accusations, we would reject the assignment of error.
Here again we confront an issue of first impression. The few cases in other jurisdictions that have considered the question hold inadmissible the hypnotist's opinion concerning the accused's truthfulness have rejected same. See State v. Pusch, 77 N.D. 860, 46 N.W.2d 508 (1951); Jones v. State, 542 P.2d 1316 (Okl.Cr. 1975). If this be so, it follows that a hypnotist's opinion of the prosecutrix' truthfulness should likewise be excluded. But see, Harding v. State, 5 Md. App. 230, 246 A.2d 302 (1968).
We have a ready analogy in our many cases holding that the results of a polygraph or lie detector test are not admissible in evidence. See, e.g., Pennington v. State, 437 So.2d 37, 40 (Miss. 1983); Jordan v. State, 365 So.2d 1198, 1204 (Miss. 1978); Harrison v. State, 307 So.2d 557, 562 (Miss. 1975); Mattox v. State, 240 Miss. 544, 128 So.2d 368, 371-72 (1961); and Hawkins v. State, 222 Miss. 753, 77 So.2d 263, 264-65 (1955).
Whatever value hypnosis may have as an investigative aid, it is our view at this time that it does not have the status as a science whose practitioners are capable of giving opinions regarding the truthfulness of their subjects with that high degree of validity that we demand of expert witnesses generally.
Stripped of its standing as an expert opinion, Dr. Tramontana's testimony was nothing more than an improper bolstering of the testimony of the prosecuting witness, M.P. As such it was clearly inadmissible. Bitner v. State, 293 So.2d 339 (Miss. 1974); Roberson v. State, 185 So.2d 667 *823 (Miss. 1966); Byrd v. State, 154 Miss. 742, 123 So. 867 (1929).

VI. The Prosecutrix' Hypnotically Refreshed Memory

A
Finally we reach the question of the admissibility of M.P.'s post-hypnosis testimony. We refer here to the testimony of the hypnotized, not the hypnotist. We are concerned with the admissibility of the testimony of one who has been hypnotized regarding facts explored during the hypnotic session.
Defendant has called to our attention numerous authorities suggesting that hypnosis is a state of heightened suggestibility and altered consciousness, that distortions of reality, false memories, fantasies and confabulation are likely to result, and that often, following the hypnotic experience, the witness has difficulty distinguishing between what he or she knew before the hypnotic experience and what may have been "suggested" during the hypnotic experience. In this context, Defendant argues that the testimony of M.P. has become fatally tainted and hence should not have been admitted.
This is an issue which we might pretermit on grounds it has not been procedurally preserved. Indeed, no objection was made to the testimony of M.P. on grounds that it was the product of hypnotic suggestion.[5] A further reason why we might ordinarily be inclined not to reach this issue is that we must reverse on other grounds  the trial judge's error in the admission of testimony by Dr. Tramontana.
On the other hand, this case will now go back for a new trial. At this new trial, the issue of the admissibility of M.P.'s testimony will certainly arise. We consider it appropriate to address the issue and provide the trial judge on remand such guidance as we might. Beyond that, this hypnosis issue even more than those discussed above, is one where the public interest in fair and effective law enforcement requires an authoritative response from this Court. See Quarles, Hypnosis and the Law of Evidence: Testimony from the Hypnotically-Refreshed Memory, 51 Miss.L.J. 743, 745-747, 764-766 (1981).

B.
At trial, Dr. Tramontana offered the following testimony regarding the nature and purposes of his hypnotic sessions with M.P.:
[M.P.'s mother] ... asked me again if I would do that, uh, the relaxation training with her because she said when all this came out in the open and if it got to a Courtroom situation, she was afraid that M.P. would be too, uh, uh, too uptight, would freeze up and not be able to relate what had happened.
So, during this occasion, I, uh, used the relaxation training, put her [M.P.] in a light trance, light hypnotic trance and, uh, it had a two fold purpose. One was to help her relax, to, to recondition her to do self-hypnosis on her own, to relax. But, also, to get more detailed information.
At that time, I asked her, uh, once she was in a trance, why she had, uh, told me the year before that it was all a dream. And she said, quote, because . .. [Defendant] said for me to tell you that, close quotes.
And I asked her if she always did what he told her?
She said, quote, I was scared he was going to hurt me, close quotes.
And I said did he threaten you?
And she said, quote, no, but he seemed like he would hurt me, close quotes.
And then we went on into detail about what actually happened.
Q Okay. Did she relate these to you?

A Yes, she did.

*824 Q Okay. In greater detail than in the past?

A Yes, she did.

Q Okay. And, uh, did you see ... [M.P.] again, after that?
A March 9th was the last time I saw her.
Q Now, Doctor, did, uh, how did you, for what, for what two purposes did you put her in, uh, you called it some kind of relaxed state and, then, something else?
A Light hypnotic trance.
Q Okay. Why did you do that; would you relate that to us again?
A Because she had a, uh, a high level of anxiety. And I felt, well, first of all, the mother was asking for me to reinitiate the hypnotic training, uh, with her so that she would be relaxed enough to tell about the events, when it got to, to this stage.
And, secondly, in, in, uh, in eliciting her responses concerning details, I felt that she could do it much more calmly if she were in a light trance.

[Emphasis added].
This light hypnotic trance, we are told, was sufficient to render inadmissible M.P.'s current testimony on matters discussed in the hypnotic session.[6]
Our survey of the authorities makes clear that the majority of jurisdictions that have considered the question reject Defendant's position.[7] That the witness has had a hypnotic experience goes to weight or credibility, not admissibility. Upon consideration of the authorities from other jurisdictions that have been called to our attention and for the reasons explained below, we reject this proposition but require that before testimony from the hypnotically refreshed memory may be admitted, there must have been compliance with certain safeguards.

C.
We are not about to get into the business of studying up on hypnosis so that we might become experts. We are not experts in the field and have neither the capacity nor the inclination to become such. That job we relegate to the psychiatrist, the psychologist and other properly trained and experienced hypnotists.
Having decided that hypnotically-refreshed testimony is not per se inadmissible, we must consider under what conditions such testimony will be allowed. We have tried to acquire a layman's awareness of the subject and particularly of potential problem areas. This we must do to render ourselves able to declare with a modicum of competence safeguards for the admission of such testimony. In this context, we set forth these excerpts from the writings of experts which serve to provide a general feel for our subject.
One leading expert has written:
The hypnotic suggestion to relive a past event, particularly when accompanied by questions about specific details, puts pressure on the subject to provide information for which few, if any, actual memories are available. This situation may jog the subject's memory and produce some increased recall, but it will also cause him to fill in details that are plausible but consist of memories or fantasies from other times. It is extremely difficult to know which aspects of hypnotically aided recall are historically accurate and which aspects have been confabulated... . Subjects will use prior information and cues in an inconsistent and unpredictable fashion; in some instances such information is incorporated in what *825 is confabulated, while in others the hypnotic recall may be virtually unaffected.
As a consequence of these limitations, hypnosis may prove useful in some instances to help bring back forgotten memories following an accident or a crime while in others a witness might, with the same conviction, produce information that is totally inaccurate... . As long as this material is subject to independent verification, its utility is considerable and the risk attached to the procedure minimal. There is no way, however, by which anyone  even a psychologist or psychiatrist with extensive training in the field of hypnosis  can for any particular piece of information determine whether it is an actual memory versus a confabulation unless there is independent verification.
(Emphasis in original) Orne, The Use and Misuse of Hypnosis in Court, 27 Int'l J. Clinical & Exper. Hypnosis 311, 317-18 (1979). In Diamond, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness, 68 Cal.L.Rev. 313 (1980), Professor Diamond explains that recollections of a witness who has been hypnotized may become contaminated.
Hypnotized persons, being extremely suggestible, graft onto their memories fantasies or suggestions deliberately or unwittingly communicated by the hypnotist. After hypnosis the subject cannot differentiate between a true recollection and a fantasy or a suggested detail. Neither can any expert or the trier of fact. This risk is so great, in my view, that the use of hypnosis by police on a potential witness is tantamount to the destruction or fabrication of evidence. Recently, some courts have shown a healthy suspicion of the veracity of this sort of testimony. Yet even under stringent safeguards, including presentation to the trier of fact of the fullest possible information on the effects of hypnosis, the trier will not be able to sort out reality from witness fantasy and weigh this testimony properly.
(Footnotes omitted.) Id. at 314-15. Further:
The evidence, however, is that the effect of suggestions made during hypnosis endures. Although the more theatrical types of posthypnotic suggestion may last only hours or days, less obvious suggestions may last years or even a lifetime. A highly pertinent example is the so-called "posthypnotic source amnesia". This occurs when something learned under hypnosis is carried into the wakened state but the fact that the memory or thought was learned under hypnosis is forgotten. A sizable proportion of hypnotic subjects spontaneously do so, and the incidence of source amnesia can be increased by suggestions from the hypnotist. A subject who has lost the memory of the source of his learned information will assume that the memory is spontaneous to his own experience. Such a belief can be unshakeable, last a lifetime, and be immune to all cross-examination. It is especially prone to "freeze" if it is compatible with the subject's prior prejudices, beliefs, or desires. This type of distorted memory is very apt to appear genuine and spontaneous, and will be unlikely to disappear.
One can only conclude that hypnosis can induce subtle but highly significant distortions of memory that will persist indefinitely, distorting all subsequent related recall of the subject. My own experience has convinced me that even communications and other cues to the subject made in the normal, waking state, both before and shortly after the hypnotic session, may be similarly influenced by the hypnotic experience. Thus the police may tell a witness something just before hypnosis and then hypnotize him. When he awakens, his "source amnesia" may lead him to believe that the police statement was a product of his own memory. Sometimes communications made to the patient after hypnosis may be retroactively integrated into the hypnotic recall. The subject may recall a fact with no awareness that it was not the product of his own mind. Or he may recall being told the fact but insist that he had prior *826 knowledge of it. This often happens when subjects are shown photographs or line-ups for identification just before or just after hypnotic sessions. In my experience, time, rather than weakening the effects of the hypnotic distortion, tends if anything to fix it into a permanent pattern. Therefore, the pretrial hypnosis of a witness appreciably influences all of his subsequent testimony in ways that are outside the consciousness of the witness and difficult, if not impossible, to detect.
(Footnotes omitted.) Id. at 335-36.
The Executive Council of the Society for Clinical and Experimental Hypnosis unanimously adopted a resolution on October 19, 1978, which reads in part:
Because we recognize that hypnotically aided recall may produce either accurate memories or at times may facilitate the creation of pseudo memories, or fantasies that are accepted as real by subject and hypnotist alike, we are deeply troubled by the utilization of this techniques (sic) among the police. It must be emphasized that there is no known way of distinguishing with certainty between actual recall and psuedo memories except by independent verification... . .
The dangers universally noted by the courts that have considered admissibility of hypnotically refreshed testimony are at the heart of M.P.'s testimony. At different times prior to the hypnotic sessions, M.P. had told both her mother and Dr. Tramontana that she had dreamed of the Defendant and others committing various sex acts with her. On January 27, 1981, the day after the otherwise uncorroborated incident in question, M.P. told her mother, "You know those dreams I've been having? They're not dreams."
At trial the critical issue was whether M.P. was describing dreams or actual past occurrences. Here M.P. told her mother of the Defendant's actions before the hypnotic experience. This would be a factor supporting admissibility of the post-hypnotic testimony. Still, the fact that the core issue was dreams versus reality viewed in context of the hypnotized person's heightened susceptibility to having fantasies and dreams translated into unshakable post-hypnotic false memory suggests the importance of faithful conformity on retrial with the guidelines we prescribe below.
We find no dissent from the proposition that "minimum safeguards must be established". Quarles, Hypnosis and the Law of Evidence: Testimony from the Hypnotically-Refreshed Memory, 51 Miss.L.J. 743, 765 (1981). Our concern is what those safeguards should be.
The authorities cited to us by counsel contain specific suggestions for safeguards which we have carefully studied. See, e.g., Quarles, supra, 51 Miss.L.J. at 765; State v. Hurd, 86 N.J. 525, 432 A.2d 86, 89-90 (1981); People v. Lucas, 107 Misc.2d 231, 435 N.Y.S.2d 461, 464 (1980), citing People v. Lewis, 103 Misc.2d 881, 427 N.Y.S.2d 177, 179 (1980), which cited Warner, The Use of Hypnosis in the Defense of Criminal Cases, 27 Int'l J. Clinical & Exper. Hypnosis, No. 4 at 417 (1979). We find a substantial consistency and agreement between the various suggestions for minimum safeguards.
Without further ado, we hold that, before a witness who has had a hypnotic experience may be allowed to testify in any criminal prosecution in this state regarding matters explored during the hypnotic experience, the trial judge must in advance conduct a hearing outside the presence of the jury and determine whether the following minimum safeguards have been complied with:
(1) The hypnotic session or sessions must have been administered by a licensed psychiatrist or psychologist trained in the use of hypnosis.
(2) Any information given to the hypnotist by law enforcement personnel, by the defendant or from any other source prior to the hypnotic session should be in written form and should be preserved so that subsequently the extent of the information the subject received from the hypnotist may be determined.
*827 (3) Before induction of hypnosis, the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them, carefully avoiding any new elements to the witness' description of the events. The witness' pre-hypnotic memory should be preserved via tape recording or, if possible, video tape.
(4) The entire procedure of hypnosis and the hypnotic interview should be tape recorded or, if possible, video taped.
(5) Only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and post-hypnotic interview.
(6) The opposing party or parties should have full access, prior to trial, to the recording of the hypnotic interview. See Rule 4.06, Miss. Uniform Criminal Rules of Circuit Court Practice.
(7) All opposing parties must be given free rein to cross-examine the hypnotically-induced witness and/or the hypnotist[8] regarding the witness' memory and the particular procedure used to refresh it.
(8) No hypnotically-enhanced statements made by a witness or victim may be received into evidence unless there is available otherwise admissible corroborating testimony or physical evidence which tends to substantiate the hypnotically-enhanced statements.
Compliance with these guidelines is mandatory. Advance determination of compliance by the trial judge outside the presence of the jury is likewise mandatory. Even though there be full compliance with the guidelines, the trial judge is charged to consider carefully the credibility of the victim's hypnotically refreshed memory. Before allowing the jury to hear it, the trial judge should be satisfied (a) that the guidelines have been complied with and (b) that the probative value of the victim's hypnotically refreshed memory outweighs the risk of unfair prejudice to the accused.
We are unable to ascertain from the record whether the post-hypnotic testimony of M.P. would be admissible under these standards. On remand, the trial judge should evaluate that testimony under the minimum standards outlined above. Only if there is substantial compliance with each of these guidelines may the post-hypnotic testimony of M.P. be received into evidence.

D.
Leaving aside the testimony of the psychologist hypnotist, the case against the defendant rests squarely on the testimony of the eight year old prosecutrix. Children of tender years have generally been permitted to testify in our courts. See Yarbrough v. State, 202 Miss. 820, 32 So.2d 436 (1947) (5-year-old); Peters v. State, 106 Miss. 333, 63 So. 666 (1913) (6-year-old); Thomas v. State, 222 Miss. 488, 76 So.2d 242 (1954) (8-year-old); Jackson v. State, 158 Miss. 524, 130 So. 729 (1930) (7-year-old); Trim v. State, 33 So. 718 (Miss. 1903) (5-year-old); Fairley v. State, 152 Miss. 656, 120 So. 747 (1929) (4-year-old); Wilson v. State, 221 So.2d 100 (Miss. 1969) (7-year-old). Still, common sense suggests that their testimony be viewed with caution.
The determination whether a child is a competent witness is generally committed to the sound discretion of the trial judge. Before he allows a child of tender years to testify, the trial judge should satisfy himself that the child has the ability to perceive and remember events, to understand and answer questions intelligently, and to comprehend and accept the importance of truthfulness. Ellis and Williams, Mississippi Evidence § 2-3 (1983).
Her hypnotic experience aside, M.P. was a competent witness, though an eight year old. Once hypnosis enters the scene, we have a different matter. Suffice *828 it to say that on remand, in addition to adherence to the guidelines set forth above, the trial judge should consider carefully this child's possible susceptibility to fantasy or false memory.

VII.
For the reasons set forth above, the judgment of conviction of Ladd Herbert House, III for the offense of unnatural intercourse is vacated, together with the sentence of imprisonment heretofore imposed in connection therewith, and this case is remanded to the Circuit Court of Harrison County, Mississippi, for a new trial on all issues, not inconsistent with this opinion.
REVERSED AND REMANDED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, HAWKINS, DAN M. LEE and PRATHER, JJ., concur.
BOWLING, J., not participating.
NOTES
[1] For reasons which we trust are obvious, we refer throughout this opinion to the prosecutrix only by her initials, "M.P."
[2] While this Court has never considered the role that hypnosis should play in the courtroom, apparently hypnosis has been used by law enforcement in this state in recent years. See, e.g., Depreo v. State, 407 So.2d 102, 107 (Miss. 1980) (Use of hypnosis on potential witness mentioned but issue not considered); Letter from J. Stephen Wright, Special Assistant Attorney General of Mississippi, to W.E. Felts, City Clerk, Indianola, Mississippi (March 7, 1980) (an Attorney General's opinion concerning the proper use of hypnosis by law enforcement personnel); Quarles, Hypnosis and the Law of Evidence, 51 Miss.L.J. 743, 744-47 (1981) (discussion of actual case in Mississippi where hypnosis was used to obtain a conviction).
[3] See footnote two, supra.
[4] The Quarles article cited in footnote two was prepared by Dr. Chester L. Quarles, Director of the Law Enforcement Program within the Department of Political Science at the University of Mississippi. It presents a competent and insightful pro-law enforcement, pro-prosecution view of the hypnosis issues in this case.
[5] It is not clear that at the time M.P. testified defense counsel knew of her hypnotic experiences.
[6] We emphasize here that hypnosis does not render a witness incompetent to testify to matters remembered and related prior to the hypnotic session. United States v. Valdez, 722 F.2d 1196, 1204 n. 37 (5th Cir.1984).
[7] See, e.g., United States v. Awkard, 597 F.2d 667 (9th Cir.1979); United States v. Miller, 411 F.2d 825 (2d Cir.1969); State v. Hurd, 86 N.J. 525, 432 A.2d 86 (1981). But see United States v. Valdez, 722 F.2d 1196 (5th Cir.1984) (uncorroborated post hypnotic identification of a defendant inadmissible per se, where witness knew the defendant to be under suspicion, but was unable to identify defendant prior to hypnosis).
[8] The hypnotist, of course, will be a necessary witness in the State's effort to qualify for receipt into evidence the victim's hypnotically-refreshed memory. That the hypnotist may testify in this context is in no way inconsistent with our earlier holdings (a) that the hypnotist may not relate, to establish the truth thereof, facts regarding the crime told him by the victim, and (b) that the hypnotist may not give a so-called expert opinion regarding the victim's truthfulness.