652 So.2d 153 (1995)
Joseph A. THIBODEAUX, Jr.
v.
STATE of Mississippi.
No. 91-KA-01006-SCT.
Supreme Court of Mississippi.
March 9, 1995.
Stanford Young, Waynesboro, for appellant.
Michael C. Moore, Atty. Gen., Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PRATHER, P.J., and PITTMAN and SMITH, JJ.
*154 SMITH, Justice, for the Court:
Joseph A. Thibodeaux, Jr. was indicted and tried in Wayne County Circuit Court for the offense of capital murder of Hilton [Ike] Shoemake, a game warden in Wayne County. The jury returned a verdict of guilty of murder. Thibodeaux was sentenced to serve a term of life in the custody of the Mississippi Department of Corrections.
Aggrieved, Thibodeaux appeals to this Court presenting the following assignments of error for review:
1. WHETHER JOSEPH THIBODEAUX, JR. SHOULD HAVE BEEN CONVICTED OF MURDER FOR THE ACCIDENTAL SHOOTING OF A GAME WARDEN NAMED IKE SHOEMAKE.
2. WHETHER UNDER THE WEATHERSBY RULE AS STATED IN Minnick v. State, 551 So.2d 77 (Miss. 1988), TESTIMONY OF THE APPELLANT/DEFENDANT, JOSEPH THIBODEAUX, JR., WHO WAS THE EYEWITNESS, SHOULD HAVE BEEN ACCEPTED AND A VERDICT OF ACQUITTAL ORDERED BY THE LOWER COURT:
(A) WHEN THE SAID TESTIMONY OF JOSEPH THIBODEAUX, JR. TAKEN BY THE POLICE ABOUT AN HOUR AFTER THE SHOOTING OCCURRED SHOWED THAT THE ACCIDENT WAS AN ACCIDENT;
(B) WHEN THE TESTIMONY OF JOSEPH THIBODEAUX, JR. WAS TESTED UNDER THE TRUTH SERUM OR SODIUM AMYTAL BY A QUALIFIED PSYCHIATRIST, AND THE SAID PSYCHIATRIST'S TESTIMONY AS TO WHETHER OR NOT JOSEPH THIBODEAUX, JR. WAS TELLING THE TRUTH. THE COURT REFUSED TO ALLOW THE PSYCHIATRIST TO TESTIFY THAT THE SODIUM AMYTAL TEST WAS RELIABLE AND THAT THE TEST WAS ADMINISTERED UNDER THE GUIDE LINES OF House v. State, 445 So.2d 815 (Miss. 1984), AND THAT IN THE PSYCHIATRIST'S OPINION, JOSEPH THIBODEAUX WAS TELLING THE TRUTH UNDER THE SODIUM AMYTAL TEST;
(C) WHEN THE TESTIMONY OF JOSEPH THIBODEAUX, JR. WAS SHOWN TO BE THE TRUTH BY THE HYPNOTIC INTERVIEW CONDUCTED BY A PSYCHIATRIST UNDER THE GUIDELINES OF House v. State, 445 So.2d 815 (Miss. 1984), AND THE COURT REFUSED TO ALLOW THE PSYCHIATRIST TO TESTIFY.
3. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE TO USE THE CONVICTION OF THE APPELLANT/DEFENDANT'S WITNESS, GUNSMITH JOHN TERRY, OF FALSIFYING RECORDS WHEN YOUR APPELLANT/DEFENDANT HAD FILED A MOTION WITH THE COURT REQUIRING THE STATE TO PRODUCE ALL SUCH TESTIMONY; AND THE STATE HAD DELIBERATELY CONCEALED SAID TESTIMONY. YOUR APPELLANT/DEFENDANT DID NOT KNOW OF THE CONVICTION OF THE GUNSMITH.
4. WHETHER THE COURT ERRED IN NOT ALLOWING THE VIDEOTAPE OF THE SODIUM AMYTAL INTERVIEW OF THE APPELLANT/DEFENDANT, JOSEPH THIBODEAUX, JR., BY THE PSYCHIATRIST, DR. CARMEN PALAZZO, INTO EVIDENCE.
5. WHETHER THE COURT ERRED IN NOT ALLOWING THE INTRODUCTION INTO EVIDENCE OF THE APPELLANT/DEFENDANT BEING EXAMINED UNDER HYPNOSIS BY DR. CARMEN PALAZZO UNDER THE GUIDELINES OF House v. State, SUPRA.
6. WHETHER THE COURT ERRED IN OVERRULING APPELLANT/DEFENDANT'S MOTION TO CONDUCT IN CAMERA INSPECTION OF THE DISTRICT ATTORNEY'S FILE *155 WHICH WOULD HAVE REVEALED THAT THE DISTRICT ATTORNEY WAS CONCEALING THE FACT THAT THE APPELLANT/DEFENDANT'S GUNSMITH WITNESS HAD BEEN CONVICTED IN ALABAMA OF FALSIFYING GUN SALE RECORDS. THE GUNSMITH HAD BEEN HIRED TO SHOW THAT THE GUN IN QUESTION WOULD SHOOT AS THE APPELLANT/DEFENDANT HAD TESTIFIED IT WOULD SHOOT. THIS WAS VERY PREJUDICIAL TO THE APPELLANT/DEFENDANT'S CASE TO SURPRISE THE APPELLANT/DEFENDANT WITH THE FACT THAT HIS EXPERT WITNESS ON GUNS HAD BEEN CONVICTED OF ALTERING GUNSMITH RECORDS.
7. THAT THE COURT ALLOWED THE DISTRICT ATTORNEY TO TELL THE JURY THAT IF THE STATE WAS REQUIRED TO PROVE BEYOND ALL DOUBT THAT THE JURY WOULD HAVE TO SEE IT WITH THEIR OWN EYES WHICH WAS OBJECTED TO AND OVERRULED.
8. DID THE COURT ERR IN OVERRULING APPELLANT/DEFENDANT'S OBJECTION TO UNIFORMED GAME WARDENS SITTING IN THE COURTROOM ON SEVERAL OCCASIONS WHICH WOULD BE INTIMIDATING TO THE JURY.
9. WHETHER THE COURT ERRED IN ALLOWING THE STATE TO INTRODUCE EVIDENCE BY THE INVESTIGATING SHERIFF OF A STATEMENT NOT PRODUCED IN DISCOVERY.
10. WHETHER THE COURT ERRED IN EXCLUDING THE VIDEOTAPED INTERVIEW OF THE STATE'S WITNESS, JOHN DEAN, BY THE APPELLANT/DEFENDANT'S ATTORNEY WHICH WOULD HAVE DEMONSTRATED THAT THE STATE'S WITNESS, JOHN DEAN, WAS TELLING A DIFFERENT STORY THAN HE TOLD ON THE WITNESS STAND CONCERNING HEARING SHOTS AT A CERTAIN TIME. THIS WAS CRUCIAL TO THE APPELLANT/DEFENDANT'S CASE IN THAT AS SOON AS THE GAME WARDEN WAS ACCIDENTALLY SHOT, YOUR APPELLANT/DEFENDANT RUSHED HIM TO THE HOSPITAL AS FAST AS HE COULD, AND THE EVIDENCE SHOWS THE TIME OF ARRIVAL AT THE HOSPITAL BEING EXACTLY WHAT THE APPELLANT/DEFENDANT TESTIFIED TO.
11. ALSO, ANY OTHER ERRORS AS SHOWED [SIC] BY THE TRANSCRIPT OF THE TESTIMONY HEREIN.
Thibodeaux's Issue 7, though listed, was not briefed. No support was cited or argued. Issues 8, 9 and 11 were never argued by Thibodeaux, thus are without any supporting authority whatever. Issue 10 contains a single paragraph of argument without any supporting authority. This Court agrees with the State's suggestion that those issues unsupported and not argued are abandoned and need not be considered. Pate v. State, 419 So.2d. 1324, 1325-26 (Miss. 1982).
Issue 1 is controlled by this Court's resolution of the remaining addressed Issues: 2(b) and (c), 3, 4, 5 and 6.
Thibodeaux begins by arguing that the shooting was a mere accident and accordingly he should not have been convicted of murder. Thibodeaux argues that the familiar "Weathersby Rule" applies. Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933). Weathersby does not apply to this case. The shooting of Shoemake was not accidental under the law, as determined by the verdict of the jury. Thibodeaux was properly convicted of murder.
No error by the trial court or discovery violation by the State occurred in the cross-examination of Thibodeaux's firearms expert concerning his conviction of falsifying firearms records.
*156 The vast majority of Thibodeaux's argument on appeal focused on the admissibility of videotapes of Thibodeaux's interviews while under the influence of hypnosis or sodium amytal conducted by his expert witness, Dr. Carmen Palazzo. Thibodeaux cites House v. State, 445 So.2d 815 (Miss. 1984) in support.
Thibodeaux has misconstrued what this Court said in House, which clearly was that an expert may not testify to his opinion that a witness was telling the truth during a hypnotized session. Further, the House guidelines are applicable to whether a witness whose memory has been hypnotically refreshed may testify at trial. Thibodeaux testified without objection by the State at trial. In this first impression issue of a witness interviewed under the influence of both hypnosis and sodium amytal, this Court, as in House, once again holds that these fields are not recognized as reliable science. Since the opinion of Dr. Palazzo that Thibodeaux was telling the truth would be simply "improper bolstering" of testimony, we decline to allow such testimony. There is no merit to any of Thibodeaux's assigned issues and we must affirm the verdict of the jury.

FACTS
The testimony of Joseph A. Thibodeaux, Jr. is here presented first in order to benefit the reader of the circumstances surrounding the shooting. Thibodeaux, a resident of Slidell, Louisiana, testified that he was visiting his father-in-law, Jimmy Combs, in Wayne County, Mississippi, during the Christmas holidays. He arrived at Combs' house on December 23, 1990.
Thibodeaux stated he had hunted deer "three or four times" previously and once before in Wayne County. On the day of the shooting, December 26, Thibodeaux testified he hunted earlier in the afternoon with Mr. Alfred Bunch. The rifle Thibodeaux used was given to him for Christmas in 1990. Later that evening, Thibodeaux brought Mr. Combs' mother to Combs' house and then "sat down in the tree stand just to watch the deer." He got hungry, went inside and ate dinner. He then spent time talking to Mr. Combs' aunt, Ms. Overstreet, who was preparing to leave and smoked some cigarettes. By then, Thibodeaux stated, it was "maybe two or three minutes til 8:00, maybe a little later, you know. I know it was about eight o'clock because I kind of glanced at my watch and I seen the 8:00." He then picked up his rifle and headlight and walked outside. He stated, "I shined all around looking around, just looking. That is all I was really doing, was just walking and looking. I wasn't really planning on doing anything." Thibodeaux stated he noticed some rabbits and an armadillo and kept walking: "I wasn't planning on hunting. In other words, just walking. If I seen anything, fine. If I did not see anything, that was great to [sic]. I wasn't planning on shooting anything." Thibodeaux added that due to a recent disc surgery, his doctor had advised him he could re-injure his back by firing his rifle. Thibodeaux described the shooting:
Okay. I got down the path, walking, shining my light in the grass. When I reached  I can't say exactly halfway or whatever, all right, I was walking sideways slowly, just walking, shining my light in the grass, and I heard something behind me. I turned around. I looked and all I seen was greens, the bush in front of me and nothing else. And all of a sudden, a bright light hit here and scared me, because all I seen was the bushes. My gun started going off after I just heard hey. It was just that fast, the light  hey  boom. It was that quick.
* * * * * *
All right. I guess you could say I was like squatted down. I was shaking so bad. It just had me shook up. And finally, after a while, I heard somebody say, hey, help me, you know, I have been shot.
* * * * * *
I was scared. I said, please, don't scare me no more. I said, I will help you as soon as I can see, because all I could see was white spots in front of my eyes... . And I reached down and I felt, I guess it was his arm or whatever, and I told him I will help you. So, I tried to pick him up, *157 stand him up. And I took his arm and put it over my shoulder.
* * * * * *
Then he turned and like to knock me off balance. Okay. And he said, take me to my truck. And he was heading towards the back of the property. I said, look, if you are shot and you are hurt I will take you to the hospital... . We started walking. He kept trying to go different directions. And it was hard to get him up there, you know, to the house. We stopped a couple of times, you know, he kept turning and jerking and stuff.
* * * * * *
I got in front of the barn and I couldn't go no more. I was hurting so bad. I told him, I said, wait here and I will go get the truck and some help. I helped him get down. I ran towards the house as fast as I could. I run inside. And I guess I took my gun and laid it down on the sofa. And I got my father-in-law and told him what had happened, that I had shot somebody I guess. You know, I didn't mean to shoot nobody. Its just, when I got scared the gun went off. My father-in-law come outside with me, got in the truck, went over to the barn. I jumped out of the back of the truck, ran over to Mr. Shoemake  I found out when my father-in-law told me who it was.
Thibodeaux stated that Combs got out of the truck, bent over the warden and said, "Ike." The warden replied, "Jimmy, help me, I've been shot." Thibodeaux concluded, "we got him up, put him in the truck. And the last thing I can remember clearly is getting in the back of the truck."
Thibodeaux testified he had never before seen Ike Shoemake, although he (Thibodeaux) and Combs once passed Shoemake's vehicle while traveling in their own truck. Referring to his statement to police after the shooting, Thibodeaux stated he was then "very nervous and upset." He stated the only difference between the statement and his trial testimony was that he did not know Shoemake at the time of the shooting, although the statement was written to the contrary.
Thibodeaux demonstrated for the jury the manner in which he was holding the gun and his light and a battery, the latter carried in his field jacket, at the time of the shooting. He stated he thought the safety was "on." He further stated, "when it went off, it went way back like this here and kind of drove me back and it just kept firing." He knew it fired at least two times, "but it sounded like it was going off constantly." He stated he didn't intend to shoot Shoemake, or shoot at all, he was simply scared.
On cross-examination, Thibodeaux was asked whether, while hunting with Alfred Bunch, earlier on December 26th, he had carried his rifle, draped over his arm, safety off, finger on the trigger, and a shell in the chambers? Thibodeaux responded, "I guess I was." When asked if he had seen a buck, would he have shot him? Thibodeaux replied, "I doubt it." He was afraid he would injure his neck again. It was revealed that the area where the shooting occurred was an area of rye grass fields where deer were hunted. The fields were baited with corn and a mineral block. It was a baited field. Thibodeaux denied knowing anything about the corn. He stated that when Combs claimed his son-in-law put the corn in the field he was referring to Earl Miller, Combs' other son-in-law. Thibodeaux claimed to have carried the .270 rifle on the night of the shooting, "In case a wild animal would take after me." The prosecutor asked, "Like what?" Thibodeaux replied, "A cat. They have a big black cat out there."
Thibodeaux admitted on cross-examination: "I guess I would have to say I was hunting... . Yes, I guess I went up there to hunt. Yes, sir... . Nervous because I was illegally hunting." The prosecutor asked, "You were illegally hunting deer and you killed a man?" Thibodeaux replied, "Yes, sir." Next, the prosecutor asked, "When you are looking for an animal with a light you are not expecting a light to come back at you?" Thibodeaux replied, "No, sir."
Returning to the State's case in chief, the State called Jackie Walters, a Laurel policeman, who testified that he was on duty December 26, 1990, when he was called to University *158 Medical Center. He learned about the shooting and was instructed to take Thibodeaux to the police station. Walters was present when other officers had Thibodeaux sign a waiver of rights form and interviewed Thibodeaux. Walters stated the interview was essentially a narrative by Thibodeaux of the evening's events.
On cross-examination, Walters noted he arrived at the hospital at approximately 9:05 p.m. that night. Thibodeaux's statement indicated it was taken at 9:45 p.m., forty minutes later. Walters testified while being transported to the police station, Thibodeaux kept saying "something to the effect that he wanted to help Mr. Shoemake... ." Walters agreed that in giving his statement, Thibodeaux told the officers that "somebody hollered `hey', and he turned around and the light went in his eyes and the gun went off."
Sheriff Marvin Farrior of Wayne County, Mississippi, testified he knew the deceased, Ike Shoemake, nearly forty years. Shoemake had been a game warden for about sixteen years at the time of his death. Shoemake had authority to handle game violations anywhere in Wayne County.
On December 26, 1990, the sheriff received a call that Shoemake had been shot and was in the Laurel hospital. Farrior went to his office and then to "Jimmy Combs' place." Farrior stated the place was on leased sixteenth section land, and that Combs actually lived in Louisiana, but came up to hunt on the land. The home was located in Wayne County, about sixteen miles from Waynesboro and twelve miles from Laurel. Ms. Eglar Overstreet, answered the door at the Combs house. Farrior thought that Ms. Overstreet was Jimmy Combs' mother. Ms. Overstreet knew nothing about Mr. Shoemake being shot but said Combs had gone to the hospital. Inside the house, Farrior retrieved a .270 Remington semi-automatic rifle laying on the couch, a ski mask, a clip, ten rounds of ammunition, a battery, a hunting light and a hunting knife. Farrior testified he turned the items over to Don Sumrall, crime investigator for the State Highway Patrol. The sheriff left the house and began looking for a [deer] tree stand. He drove his vehicle between two gates, down a hill and found a tree stand, a shooting house and two green patches. Farrior stated when the call of the shooting came in, he was told to pick up Shoemake's gun because Shoemake "had jumped out on a man at the shooting house." However, Farrior did not locate the gun. At the time, the sheriff was not aware he had driven his vehicle to the area of the shooting, but testified he had no problem driving in the area. Farrior next drove directly to the hospital in Laurel, the trip taking approximately thirteen (13) minutes.
After learning Shoemake had died, Farrior went to the police station where he read the statement Thibodeaux had given. Farrior was given Thibodeaux's outer clothing, a camouflage field jacket and coveralls. Farrior and three other officers returned with Thibodeaux in their custody to the crime scene. Farrior testified Thibodeaux got out of the car and said, "I don't know what in the damn hell he was doing down there, nobody is suppose [sic] to be down there anyhow." Farrior stated Thibodeaux was aware Shoemake had died and did not sound remorseful. Other officers there had already found Shoemake's shotgun, belt, pistol and flashlight between Combs house and the barn. An officer also located two (2) empty .270 cartridges down the path where Farrior learned the shooting took place. Thibodeaux agreed to have a blood sample taken and was returned to the hospital. Farrior took Thibodeaux to the Wayne County Jail at 2:00 a.m. on December 27.
Farrior stated upon further investigation he learned that Thibodeaux's statement that he set out to the deer stand near Combs' house at approximately 8:00 p.m. was not true; the time was closer to 7:30 p.m. He reached this conclusion upon talking to three persons  John Dean, Buford Fowler and Mrs. Roy Bates. Dean lived one quarter mile from the scene of the shooting, Fowler lived "across two forties," (one-half mile) and the Bates' lived 400 yards away. The sheriff had Combs' property surveyed. It was less than 200 yards from the house to the deer stand and about 110 yards from Combs' house to the spot where Shoemake was shot. Shoemake was shot 60 feet from the shoot house and picked up 75 steps from where he *159 was shot. Two cartridges from the .270 rifle were found by the woods road, 23 feet from the gallberry bushes where Shoemake was positioned when shot.
Farrior testified his investigation revealed Thibodeaux was not truthful in stating he was hunting for the first time at night on the night of December 26. Thibodeaux also stated when he was walking he heard a sound behind him. Farrior's investigation showed Shoemake would have approached Thibodeaux from the right side in walking from the house to the deer stand. Thibodeaux's statement indicated that after shooting, he walked to the person and discovered it was "Ike Shoemake." Farrior stated that was inconsistent with Thibodeaux's later statements that he did not know who it was that he had shot.
Farrior had worked with Shoemake in law enforcement and stated Shoemake was "real professional." He stated Shoemake was "easy going" and could talk his way out of any situation he encountered. Farrior stated Shoemake always introduced himself as a game warden when arresting someone in that capacity. Farrior estimated he was with Shoemake on at least fifty occasions when arrests were made. Shoemake, in his previous job, would always identify himself by saying "Constable Shoemake" when preparing to approach or arrest someone. When Shoemake became a game warden, Farrior recalled being with Shoemake on two occasions when an arrest was made. Again, upon approaching possible violators, Shoemake said, "game warden."
Thibodeaux's written statement was that he was able to help Shoemake get to the barn after shooting him. The barn was seventy five steps away, "up a hill." Farrior's investigation showed no evidence Thibodeaux had assisted Shoemake, since Thibodeaux s outer clothing revealed only "one little spot or smear of blood on the leg." Farrior stated that a trail of blood led from the point of the shooting up the hill in a "zigzagging" pattern. Farrior stated that someone familiar with the land would have gone up the woods road which was 9 to 10 feet wide and the best way to Combs' house. It appeared Shoemake had fallen along the way since at one point there was a large puddle of blood. Shoemake's knees were bruised and his clothing was saturated with blood. Farrior testified Shoemake weighed at least 225 pounds and there was "no way" for Thibodeaux to help Shoemake as well as carry his own rifle and light to the barn without getting more blood on him. Further, the fact that Shoemake's shotgun had dirt in the barrel indicated to Farrior that Shoemake used it as a crutch. Farrior described the .270 rifle in evidence as fairly new, with no blood or dirt on it. In testing it, he noted it had no recoil and the trigger had to be pulled each time it was fired. He tested the gun by shooting with it laying across his left forearm.
Farrior stated Shoemake arrived at the hospital at 8:50 p.m. the night of the shooting. From witnesses, he estimated the shooting had occurred about an hour and twenty minutes prior. Farrior testified the weather that night was very cold and slightly overcast. It was very dry and Farrior saw no reason why a truck couldn't have been driven to the location of the shooting, as he had driven his own car there that same night. Photographs of the crime scene, testified by Farrior to be accurate and fair representations of the scene as it existed on December 26, 1990, were received into evidence. Farrior estimated it would normally take a person a minute and a half to travel from the house to the place Shoemake was shot. At no time in the investigation did Farrior consider the incident an accident.
Upon cross-examination, Farrior testified it was a black night when the shooting occurred, with no lights nearby. If Shoemake was stationed behind the gallberry bushes, as Farrior believed, Shoemake would have been fully concealed from Thibodeaux as the latter walked down the trail from the house. Farrior stated he felt Shoemake made his presence known when Thibodeaux walked to a point about even with Shoemake's position. Investigation showed Shoemake was shot once, that Thibodeaux's gun had been fired twice and Shoemake's once. Witnesses told Farrior there was a "time span" between the shots, but Farrior could not say how long. He stated there was no evidence of a struggle *160 between the men, and only a speck of blood was on Thibodeaux's clothes. Farrior recalled Shoemake was wearing his green, department-issued coveralls, with game warden insignia on each shoulder, and his uniform underneath. Blood was all over the coveralls. Farrior agreed Combs and Thibodeaux carried Shoemake to the hospital. Most of the blood was found at the crime scene, on the trail and the spot where he was picked up. Also, some blood was in the pickup truck's seat. Farrior stated Combs gave his statement at 3:00 a.m. the night of the shooting, and neither Thibodeaux nor Combs had a lawyer present at that time. The two were together on the trip to the hospital. Farrior testified that the investigation showed Thibodeaux had no prior felony arrests and one misdemeanor arrest in 1966, which was apparently dismissed.
Farrior agreed that if Thibodeaux helped Shoemake up the hill toward the house, they would be traveling consistently with the blood trail. He stated the blood trail ended where the truck was parked to pick up Shoemake.
On redirect, Farrior explained the blood trail did not follow the direction of the roadway; rather, the blood went through some rough terrain, hedges, stumps and some old trash piles. He stated it would have been easier to walk along the road path.
Dr. Stephen Hayne, pathologist, testified he performed an autopsy on Ike Shoemake on December 27, 1990. Shoemake suffered a gunshot wound which entered the mid-abdominal wall, near the bellybutton. There was a massive laceration over the right thigh. The bullet entered the abdominal wall, struck bony tissue and ricocheted, exiting through the right thigh. Bullet and bony tissue fragments cut many veins and arteries. Dr. Hayne testified he saw photos of the belt buckle Shoemake was wearing when shot, which he stated would have changed the trajectory of the bullet if struck. The fact that the bullet struck the belt buckle first, an "intermediate target", meant the doctor was unable to determine the position of the muzzle of the gun that fired the shot. Dr. Hayne examined Shoemake's clothing. Hayne estimated the gun was no closer than about 2 1/2 feet from the victim and noted that there was an absence of gunpowder. He would call this a "distant gunshot wound." Hayne stated the blood loss from this wound would have been "extensive and fairly rapid."
On cross-examination, the doctor estimated Shoemake would have gone into irreversible shock in ten to twenty minutes. It was unlikely a person with Shoemake's wounds could walk 110 yards without help. Hayne stated the victim would have to get to the hospital within "minutes to tens of minutes" or he would have died prior to arrival. Hayne could not exclude the possibility Shoemake was shot at 7:30 if he arrived at the hospital at 8:50, but stated it was more probable he was shot later than 7:30. Hayne testified the wound was consistent with a gun fired from approximately seven or eight feet "or even substantially further than that."
On redirect, Hayne stated it was possible a man in Shoemake's condition could crawl a short distance. Hayne stated Shoemake was at or close to being at the point of irreversible shock when he reached the hospital.
Buford Fowler testified on the night of December 26, 1990, he heard two gunshots fired between 7:00 and 8:00 p.m. He believed it was about 7:30 p.m. The shots came from south of his home, near the Bates' and Combs' houses.
On cross-examination, Fowler stated that he told police in a July 3, 1991 statement, the shot could have been anywhere from 7:00 to 8:00 p.m. Fowler agreed it could have been fired at 8:00 p.m.
Dr. Bruce Pruitt testified he treated Shoemake after the emergency room doctors were able to re-establish a pulse, though the patient was still in shock and unresponsive. Dr. Pruitt testified Shoemake was "essentially dead on arrival." Dr. Pruitt stated Shoemake's wound caused him to lose over half his blood volume. A large flap of soft tissue, fat and muscle was exposed from the exit wound. The doctor opined Shoemake was bleeding for "quite some time to have gotten that empty." Dr. Pruitt testified it was "critical" in cases like Shoemake's to get the patient to the hospital as fast as possible, preferably within the "golden hour" in order *161 to replace lost blood and oxygen. Finally, Dr. Pruitt stated Shoemake's wounds caused profuse bleeding and, "anybody that came in contact with him, close to him, close to his chest  or abdomen or with their legs beside his legs would have gotten sprayed by blood coming from his belly and his right leg."
On cross-examination, Dr. Pruitt stated Shoemake's wound was high on the right thigh and it would have sprayed out as he walked. Further, Shoemake would have had little use of the right leg due to the muscle damage. Dr. Pruitt agreed Shoemake would have needed some type of support to walk, or would have fallen or dragged one leg, leaving a trail of blood. He estimated Shoemake lost the majority of his blood within fifteen to twenty minutes of his injury. Dr. Pruitt concluded Shoemake would have been conscious and responsive, able to speak, in excess of twenty minutes after the shooting, until he had lost most of his blood.
Ms. Gwen Cole testified she worked as an emergency room clerk at South Central Regional Medical Center in Laurel. On December 26, 1990, she entered the time she admitted Shoemake to the hospital as 8:53 p.m.
John Dean testified he lived between Waynesboro and Laurel in Wayne County, about a half mile from Jimmy Combs' property. Dean heard three shots on the night of Wednesday, December 26, 1990. He heard one shot, a short pause, another shot, a longer pause, and the third shot. The first shots sounded alike, the third was different, and much louder.
On cross-examination, Dean stated he had known Combs for thirty-eight years. Dean agreed defense counsel had come to Dean's home to talk to him about the shooting of Ike Shoemake and a videotape was taken. Asked whether Dean had then told counsel "it could have been as late as 8:15 when [he] heard the shots," Dean reiterated: "I just sort of put it together that it was around 7:30. And I don't know, I still think in my mind that it was somewhere around 7:30." Dean also told Sheriff Farrior he thought the time was "around 7:30."
Lora Aria, a forensic serologist for the Mississippi Crime Lab, testified that her job was to take physical evidence from a crime and match any body fluids found thereon to known samples from suspects and/or victims. Aria found four small spots of blood on Exhibit 7, the coveralls worn by Thibodeaux the night of the shooting. The blood stains were determined to match those of the victim and the suspect, Thibodeaux, whose blood was of the same group. On further questioning, Aria stated no blood was found on Exhibit 6, Thibodeaux's field jacket.
Bonnie Shoemake, wife of Ike Shoemake, stated she was at home when her husband left on the night of December 26, 1990. The Shoemakes lived about a mile from Combs' house. Bonnie stated her husband was wearing his regular warden uniform with all the brass and patches that night. Shoemake left the house between 6:30 and 7:00 p.m. to go to Combs' house to "see if Thibodeaux was headlighting." Prior to December 26, Shoemake went to Combs' place on several nights. When asked about what contact her husband had with Thibodeaux, Ms. Shoemake replied, "They had stopped him somewhere, I think, along the road."
Sergeant Don Sumrall, a Mississippi Highway Patrol investigator, stated he was called to investigate the shooting of Shoemake on the night of December 26. Sumrall contacted other officers and the group drove to the scene. At the crime scene, behind the house and at the top of the hill in front of the small barn, Sumrall found a Game and Fish Commission cap, a flashlight, and a "Sam Brown belt," leather gear which police normally wear, with a .357 magnum still in the holster, and a pump shotgun. A large amount of blood was found in the same area. These items were all found about seventy-five steps from the place where Shoemake was actually shot. Sumrall testified Shoemake's shotgun had one spent shell in it when recovered. The shotgun had blood stains on it and dirt in the end of the barrel, about an inch deep.
Sumrall continued, there was an easily visible trail of blood from the location of the described items to the point where Shoemake had been shot. The trial of blood was "more or less bobbing, it wasn't in a straight line." Sumrall found another area on the side of the road with a lot of blood, where the leaves had *162 been disturbed. He "had the impression that the game warden had went down here, was struggling to get up the hill." The next items found on the path were two fired .270 rifle cartridges. Twenty-eight feet from the location of the cartridges, Sumrall found a large concentration of blood, the location where Shoemake had been shot. Sumrall testified Shoemake would have been on the right side of the road and the cartridges on the left. A gallberry bush was found with the grass pressed down behind it, which Sumrall believed Shoemake had been standing behind. Branches from the bush were collected as evidence.
John Michael Allen testified as the State's forensic scientist in firearms and toolmark evidence examination. Allen estimated he had examined 5000+ firearms in his career with the Mississippi Crime Lab. Allen identified the .270 rifle that he tested as the one he had received from Sumrall. One test he performed was to check the disconnector; he stated if it was not functioning, the weapon could be fired more than one time with a single pull of the trigger. Allen stated the weapon tested did not have any mechanical problems that would allow it to fire more than once with a single pull of the trigger. Allen tested the rifle using one arm and one hand. He stated it never fired more than one time either by accident or malfunction. The rifle tested within the normal range for pressure exerted to pull the trigger, and for recoil. Allen also tested the broken branches which the State submitted, part of which tested positive for the presence of lead.
Allen testified he reviewed a videotape provided by the State of two persons, one shooting a firearm and one holding the firearm. The person on tape was "saying that the gun was firing twice." Allen stated he "never heard him say `by a single pull of the trigger'" on the tape. Allen's opinion of the tape was that it showed "[i]f you pull the trigger twice the gun will fire twice. If you pull it one time and hold it, it fires once." Allen also opined that where the gun fired twice, the trigger was pulled twice, although he stated the tape was of a very poor quality and thus he could not be absolutely positive. Allen summarized that the only way he was able to make the gun fire twice was to pull the trigger twice.
Ronnie Hallman, supervisor with the Department of Wildlife and Fisheries, testified that by reference to a digest, he was able to pinpoint the time of sunset on December 26, 1990 at 5:03 p.m.
Curtis Green, training officer with the Department of Wildlife and Fisheries, supervised Shoemake during in-service training sessions. As to making arrests or approaching suspected violators at night, Shoemake was taught to first identify himself as a conservation officer. He was also instructed to hold his flashlight out away from himself, so if he attracted gunfire, it would be toward the light and not the body. Officers were also taught not to scream or otherwise startle suspects, but to speak in a normal tone.
Patrick Butler testified he was a conservation officer who had worked regularly with Shoemake. Butler estimated he had been in arrest situations with Shoemake "close to hundreds" of times. Butler stated Shoemake would identify himself as a game warden first. Shoemake instructed Butler not to frighten suspects because he could "get hurt doing that."
The testimony of Conservation Officer Danny Evans essentially corroborated that of Butler. Evans stated out in the field he personally identified himself by saying, "halt, this is the law." However, Shoemake always said, "game warden."
George T. Ewing testified he and three friends were approached by Shoemake on December 15, 1990 just after dusk. The group had been duck hunting. Ewing testified that as they left the lake, Shoemake, who was standing at the edge of a trail, "turned on the light and stood up and told us his name and told us to stop ... put down our guns ... he identified himself and everything." Shoemake issued citations to the men for various hunting offenses.
The State rested its case and the defendant's motion for directed verdict was denied. The defense called John Terry, gunsmith, as its expert witness. Terry had worked in a gunshop for nine years, cleaning and completely building and testing guns. *163 Under Terry's supervision, he and his assistant tested a .270 semi-automatic rifle provided him by the defense. The testing was videotaped and the tape played for the jury. Terry's assistant held the rifle over his left forearm, allowing his other hand to hold a flashlight. Terry stated when the gun was fired, "the gun actually jumps." According to Terry, the gun then fired again. "But in each of the times that he had fired the gun, it had gone off twice before he could arrest the recoil to actually stop the gun from firing." Terry testified the gun was tested several times and "it fired twice on each pull of the trigger." Terry stated this was due to the recoil from the first shot. Terry further stated when the gun was held in a normal position, up to one's shoulder or in such a position that the forearm of the gun is held firmly, it would not shoot more than once. Terry concluded that the trigger was pulled twice during the videotaped demonstration, but the second time it was the recoil which caused the trigger to be pulled again.
On cross-examination, Terry stated his experience with guns was from what his father taught him; he had no formal training. Terry admitted he had only tested a weapon to see whether it "fired fully automatic" about five (5) times. The .270 rifle he tested for the defense was working just exactly the way the factory designed it to work and needed no repairs. Terry first testified with that gun, you had to pull the trigger every time you wanted the gun to fire. He then stated the gun would fire twice if not held in a "normal" shooting position, referring to the shoulder. The prosecutor asked Terry to explain "if the gun is in a position where you can't arrest the recoil why doesn't it shoot the whole clip?" Terry responded that "most normal people hold a gun in a manner to have the recoil arrested by the second or third shot." Terry could not explain why the gun did not go off more than once when tested by Sheriff Farrior or Deputy Bidmer Ray Walker. Terry admitted that the gun would fire only once if held up to the shoulder or where the forearm and pistolgrip were held together. He admitted that most people could hold the gun and not have a problem with it firing twice.
Terry admitted he had been convicted in Alabama for "knowingly causing a licensed firearm dealer to make false entries" in firearm records. Terry explained the conviction was for letting somebody with a prior record receive a firearm. He also stated he had been employed by the Bureau of Alcohol, Tobacco and Firearms and police and sheriff's departments in Alabama to test fire-arms.
James Busby, a nephew of Jimmy Combs, testified that on December 26, 1990, he was employed by the Ellisville State School. He left work at 8:30 p.m., as noted on his time-sheet. He stated as went through the Trucker's Crossing Road on his way to Myrick, noted Combs' vehicle speeding toward him with emergency flashers blinking. He estimated the time was 8:45 p.m.
Ms. Dorothy Overstreet testified she was the aunt of Joseph Thibodeaux's wife. She lived about one mile from the Combs' place in Wayne County. On December 26, she went to Combs' place before dark. Thibodeaux was there cooking supper. Overstreet stated she left about 8:00 p.m. and Thibodeaux was there washing dishes; he followed her out.
Overstreet did not know what time it was when she arrived, how long it took Thibodeaux to cook supper, what time they sat down to eat, what time Thibodeaux began washing dishes or any other events. She could only say it was "about eight o'clock" when she left, and couldn't say whether the time may have varied one way or the other.
Jimmy Combs testified he was 58 years old and had known Shoemake all his life. He had worked in New Orleans but retired and returned to Wayne County. Combs stated Thibodeaux arrived at his place in Wayne County on December 23. On December 26, Thibodeaux went hunting with Combs' brother-in-law. He returned to Combs' place about 4:00 p.m., and then went to sit in Combs' tree stand. Combs stated he had been in bed that day and Thibodeaux came back to the house and cooked supper for the two men. Ms. Overstreet was also present. Combs estimated it was 8:00 p.m. when he went back to bed and Thibodeaux was washing dishes. Shortly afterwards, Thibodeaux *164 left with his gun and his camouflage clothing on. Combs stated he next saw Thibodeaux when he heard a loud noise outside and Thibodeaux "come running in." Thibodeaux advised Combs he had "accidentally shot somebody."
Combs asked Thibodeaux if he knew who the person was, and Thibodeaux did not. Thibodeaux informed Combs he had helped the person to the barn as far as he could. The two got in a truck, drove to the barn and picked up Shoemake. Combs stated Shoemake knew him and said, "Jimmy, I have been shot and I am bleeding; get me to the hospital, and get me there as fast as you can." Combs stated he and Thibodeaux "both got Mr. Shoemake up from the back" and put him into the passenger side of the truck. They went to Laurel by way of Lower-Myrick Road. He estimated this was 16 miles from Jones Hospital. On the way, Combs stated Shoemake told him he wasn't going fast enough, but Combs testified he was driving as fast as he could.
Combs could not go into the hospital after Shoemake was put on a stretcher because "I had to hold my son-in-law. He was in such bad shape until he was crying and hollering and saying I got to help him... ." Combs started experiencing chest pains and required assistance at the hospital. He left after an hour and returned home. Combs stated that the truck was "full of blood," with the seat and the floorboard soaked. The jury watched a videotape of Combs demonstrating the events of December 26, of how the men carried Shoemake into the truck, including that Thibodeaux had to hold Shoemake up against the truck while Combs went around and opened the passenger door from the inside. The videotape also showed Combs' property. Combs stated it was four hundred feet from the point Shoemake was shot to the front door. Combs testified he had always known Shoemake, and Shoemake had only checked his hunting license on one occasion. Combs denied making a statement to Sheriff Farrior after the shooting that Shoemake "has had trouble with everybody across the state." Combs repeated that Thibodeaux did not know Shoemake until Combs identified him after the shooting, although the two men had passed Shoemake's truck on an earlier occasion.
On cross-examination, Combs denied ever making a statement to a C.J. Smith in the presence of a Teet West that he, Combs, had shot an eight-point buck and two does and Shoemake was not going to bother him because if he did, "we are going to tie a block around his neck or around his leg and drop him in the Boguehoma [Lake]." Combs explained he had a Mississippi disability hunting license even though he had a Louisiana car tag, because Shoemake had told him how to get the hunting license. Combs admitted Thibodeaux's purpose in visiting him over Christmas in 1990 was to hunt. Combs also confirmed that Thibodeaux's wife (Combs' daughter) and child stayed behind in Louisiana during the Christmas holidays. Combs stated that Thibodeaux did not hunt until the 26th because the family did not hunt on Sundays or Christmas.
Combs estimated Thibodeaux came in on the night of December 26 at about 6:00 p.m. to cook supper, then ate, washed dishes and left again about 8:00 p.m. He admitted he could have told police earlier that Thibodeaux left the house at 7:30 p.m., because he was so upset. He further admitted he "most probably did" tell the police things that were not true that night because of the condition he was in. Combs admitted at the preliminary hearing he told the prosecutor he had "no idea what time" Thibodeaux left the house that night. Combs admitted also telling authorities Thibodeaux left and came back in two minutes, then later stating ten minutes at the preliminary hearing. At trial, Combs estimated Thibodeaux returned to the house in fifteen minutes, although he stated it would be hard to get to the point of the shooting in less than 6-7 minutes. Combs believed it was possible for Thibodeaux to have walked to the barn area, shot Shoemake, helped him to the top of the hill and returned to the house in fifteen minutes. Combs told the jury he never heard a shot that night, but admitted it was possible during the preliminary hearing that he testified he had heard a shot.
Referring to his statement to police the night of the shooting, Combs stated he had *165 heard a shot and Thibodeaux came back inside the house within two minutes. Combs testified, "a man could not help another fellow up the hill in two minutes that was shot." Thus, he concluded, "it had to be ten or fifteen minutes getting back in the house." Combs denied changing his statements to help Thibodeaux. Combs repeated he got to the hospital as fast as possible, in about ten minutes.
Combs did not deny that he told an investigator that Thibodeaux had told him somebody jumped out from behind a bush and grabbed him. Combs could not explain why an officer who inspected Combs' truck at the hospital observed "very little blood" in it. Combs further testified when Thibodeaux returned after the shooting, he brought his gun and light back to the house. Following the shooting, Combs was asked at the hospital if he needed to call anyone in New Orleans; he replied he was going back to his house "if they don't put me in jail." He admitted he knew a crime had been committed. On redirect, Combs stated "it was an accident."
Various witnesses testified to Thibodeaux's reputation for truthfulness. Todd Melton of Louisiana stated he was friends with Combs and Thibodeaux and had visited Combs' place to hunt. Melton stated Thibodeaux's reputation for truth was good.
On cross, Melton stated people in his community in Louisiana knew Thibodeaux to be a "good person" but admitted the subject of his being truthful had never come up. He stated his opinions about Thibodeaux were strictly from personal knowledge. Thibodeaux's co-worker, Cecil Hennes, Jr., testified to the same effect.
Hennes stated he had talked to "all of the employees" about whether Thibodeaux was a truthful person. This was after he heard about the shooting. Hennes recalled specifically discussing whether Thibodeaux was truthful but could not say why the subject was raised.
Allen Earl Busillo, Carol Seft and Charles Frederick all testified Thibodeaux was a truthful person. Each one admitted the basis for his opinion was his personal opinion.
On rebuttal, Mike Herrington, a Laurel police officer, testified that he examined Combs' truck at the hospital on the night of the shooting. Herrington testified:
Q. After everyone had gotten out and had been taken into the hospital, did you look inside that vehicle?
A. Yes, sir, I did.
Q. What can you tell the Jury about any blood that you saw inside?
A. There was a small portion looked like it was smeared on the seat from clothing or something. It was a smear of blood on the seat. And there was a spot on the floorboard as if a boot or some type object had smeared on the floor. But it was no large amount at all.
Q. No pools of blood there?
A. No, sir.

DISCUSSION
Counsel for Thibodeaux does not individually argue the listed assignments of error. Issue 1 is determined by the remaining issues considered by this Court. Half of Thibodeaux's brief is devoted to Issues 2(b) and (c), 4 and 5 concerning interviews of the appellant conducted while he was under the influence of sodium amytal or hypnosis. Basically, these are the only assignments for which Thibodeaux cites any support.

1. WHETHER JOSEPH THIBODEAUX, JR. SHOULD HAVE BEEN CONVICTED OF MURDER FOR THE ACCIDENTAL SHOOTING OF A GAME WARDEN NAMED IKE SHOEMAKE.
Whether this issue had merit depended upon this Court's resolution of the remaining assignments. Our resolution of the remaining issues leads us to conclude this issue is without merit.

2. WHETHER UNDER THE WEATHERSBY RULE AS STATED IN Minnick v. State, 551 So.2d 77 (Miss. 1988), TESTIMONY OF THE APPELLANT/DEFENDANT, JOSEPH THIBODEAUX, JR., WHO WAS THE ONLY EYEWITNESS, SHOULD HAVE BEEN ACCEPTED AND A *166 VERDICT OF ACQUITTAL ORDERED BY THE LOWER COURT.
Thibodeaux relies on the now familiar "Weathersby Rule", as articulated by this Court in Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933):
It has been for some time the established rule in this state that where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.
Id. at 209, 147 So. 481.
Thibodeaux cites Minnick v. State, 551 So.2d 77 (Miss. 1988), in arguing that the Weathersby Rule is applicable in this case. As in Minnick, Thibodeaux contends that because he was the only eyewitness to the shooting in question, his version, as set forth in his statement to police, must be accepted as the truth. However, in Minnick, this Court found the defendant's attempt to use the Weathersby Rule "totally inapplicable" as to the sentencing phase of the trial, but did provide further language relevant to Thibodeaux's position:
The Weathersby Rule is totally misplaced in the context of the jury's findings under our death penalty sentencing statute. The Weathersby Rule is applicable only in the context of whether or not the defendant killed with malice or intent; in other words, is there sufficient evidence to prove that defendant killed with malice or intent where his version of the incident as the only eyewitness, says otherwise.
551 So.2d at 97.
The State argues that the Rule is inapplicable because first, Thibodeaux's interpretation of an excusable homicide is incorrect; and second, because both the physical facts and other evidence contradict or fail to support Thibodeaux's stated version of the incident.
At various points throughout his argument, Thibodeaux argues that the State failed to prove its murder case against him and simultaneously, that the Weathersby Rule mandates that his own version of the shooting as accidental be accepted. Thibodeaux asserts:
This case is a case of the accidental shooting of a game warden and is no more than many of the other hunting accidents that occur each year in the State of Mississippi. The State of Mississippi utterly failed to prove the elements of the crime charged; this is, that Joseph Thibodeaux, Jr. shot a game warden at a time when he knew he was a game warden and when the game warden was attempting to carry out his duties. The jury so found in only convicting the Appellant/Defendant of murder. Now the case resolves to the Weathersby Rule as to whether or not the Appellant/Defendant was telling the truth, and that his version, if reasonable, must be accepted. Every bit of evidence introduced in this very lengthy trial proves this to be an accident, and the Court should reverse this case and discharge the Appellant/Defendant.
Miss. Code Ann. § 97-3-17 provides for the offense of excusable homicide:
The killing of any human being by the act, procurement, or omission of another shall be excusable:
(a) When committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent;
(b) When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation;
(c) When committed upon any sudden combat, without undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner.
As the State correctly argues, this statute is inapplicable in Thibodeaux's case even if his version of the shooting were accepted. First, Thibodeaux's own statement given shortly after the incident read, in relevant part:
"About 8:00 p.m. I was headed back to the [deer] stand to sit for a few minutes. To see if I could shine a deer just to see one. I never seen one at night but everybody *167 told me it was easy to see deer at night. This was my first time to hunt at night. When I left the house I carried my gun and light. The light was a headlight and I had it in my left hand shining as I was walking."
Accepting this as the truth, neither subsection (a) nor (c) of the cited statute is available to Thibodeaux since he was in the process of headlighting deer, an unlawful activity under (a), and in possession of a firearm, a dangerous weapon under (c). The statute defining excusable homicide does not extend to homicide committed in the course of an unlawful act nor to homicide committed with a deadly weapon. Hailes v. State, 315 So.2d 917 (Miss. 1975); Powell v. State, 279 So.2d 161 (Miss. 1973). Neither is "heat of passion" suggested or argued by Thibodeaux. Thus, his contention that the application of Weathersby Rule results in a finding that he was only guilty of an accidental, excusable homicide is unsupported.
Further, this Court in Wetz v. State, 503 So.2d 803 (Miss. 1987), explained:
Where the physical facts and circumstances in evidence materially contradict the defendant's version of what happened, the Circuit Court is not required to direct a verdict under Weathersby. Rather, the matter then becomes a question for the jury.
Id. at 809. (citations omitted).
In Fuller v. State, 468 So.2d 68 (Miss. 1985), a case very similar to the case at bar, this Court held:
In the case sub judice, appellant's version of an accidental shooting was contradicted both by witnesses for the state and by physical evidence. Bobby Fuller, defendant's sixteen year old son, testified that immediately prior to hearing a shot fired, he heard the victim cry out, "No, no." Sheriff Houston Jordan and pathologist Dr. Vijaya Dhannavada testified that a fresh laceration was observed on the knuckle of the victim. Moreover, the firearms expert testified that repeated testing of appellant's rifle indicated that the gun was not capable of malfunctioning in any manner claimed by the appellant... .
The Weathersby rule has no application to the facts of this case and the trial court's ruling on the motions was proper.
Id. at 72.
In the case at bar, Thibodeaux in his statement told officers that, "I was about 50 feet from the stand when I heard a noise in the bushes behind me and I turned around and a light hit me in the eyes, somebody hollered `HEY' and the gun went off." As in Fuller, there was proof of the victim's voice prior to the shooting. The jury could have reasonably inferred that Thibodeaux knew he was shooting at a person as only humans speak the english language and shine flashlights in the dark. Absolutely no person would expect rabbits, armadillos, or deer to be performing such human functions as shining a headlight, or hollering "Hey." The jury heard abundant testimony relating that Shoemake always identified himself as a game warden. The jury could have reasonably concluded that Thibodeaux, fearing he had been caught headlighting, intended the consequences of his act, hence malice aforethought. Moreover, the State's expert firearms witness testified that repeated testing of Thibodeaux's .270 rifle indicated that the rifle was not capable of malfunctioning in the manner Thibodeaux claimed. Also, as in Fuller, the State offered proof that three witnesses, Allen, Farrior and Walker had test fired the .270 rifle in question, held in the same manner that Thibodeaux testified that he had held it on the night of the shooting. On each test firing, it took one pull of the trigger to fire the rifle. Recoil did not cause a second pull of the trigger. There was no malfunction.
Thibodeaux's testimony and statement are contradicted on several points. First, as Thibodeaux himself noted, his statement and testimony contradict each other as to whether or not Thibodeaux knew Shoemake prior to shooting him. In the statement he says he did, in testimony he states he did not and attempts to explain the inconsistency was due to his nervousness immediately after the shooting. State's witness, Bonnie Shoemake, when asked what contact if any there had been between Thibodeaux and Shoemake testified that, "They had stopped him somewhere, *168 I think, along the road." Next, Thibodeaux stated he believed the gun's safety was "on," and the gun "just went off" and "kept firing" when he was frightened. Even Thibodeaux's expert, Terry, stated the rifle would not just go off by itself, but rather required a pull of the trigger on the first shot.
Thibodeaux admitted he was nervous about hunting illegally. The jury could have reasonably concluded that when he heard a human voice and saw the light he realized he was caught and deliberately shot toward the voice and light knowing he was shooting a human being. The State's gun expert, John Allen, testified it was not possible for the .270 semi-automatic rifle Thibodeaux was using to fire more than once without the trigger being pulled again. Recoil from the first shot did not cause a trigger pull resulting in a second shot. Allen stated that he had test fired the rifle with one hand and one arm. There was no problem arresting the recoil. The rifle functioned properly as designed by the manufacturer. State's witness Dean also testified he heard pauses between each of the three shots. The jury could have concluded that due to such pauses between the first two shots (Thibodeaux's), that his rifle did not malfunction and fire twice in rapid succession from only one pull of the trigger or from recoil, fire the second time. The jury could have reasonably concluded that the pauses indicated deliberate intent by Thibodeaux.
Further, Thibodeaux testified he assisted Shoemake by putting his arm around the victim's neck as the two went up the hill. Thibodeaux had no explanation for the fact that only "a speck" of blood was found on his outer clothing, yet Shoemake suffered a massive injury and essentially bled to death by the time he reached the hospital. Pathologist Stephen Hayne testified blood loss would have been "extensive and rapid." Dr. Pruitt testified that blood from both wounds would have sprayed anyone nearby and that Shoemake was "essentially dead on arrival."
Other physical evidence which, while not directly contradictory, was nonetheless left unexplained by Thibodeaux's testimony, includes that Thibodeaux's .270 rifle and headlight were found inside Combs' house on the couch by authorities, indicating Thibodeaux would have either left Shoemake and returned to the house with those items or somehow carried these items while also supporting Shoemake and helping him walk. Shoemake's shotgun, the barrel filled with dirt, was located between the barn and Combs' house. The State's evidence indicated that Shoemake used it as a crutch. Thibodeaux's evidence fails to address this aspect of the testimony. How did the shotgun get to the place where Shoemake was found after the shooting if he did not use it for a crutch? Did Thibodeaux carry his own rifle, headlight, help a 225 pound man who was bleeding to death from a rifle wound, and carry Shoemake's shotgun too? The jury could have logically concluded Thibodeaux simply fled the scene completely aware that he had shot Shoemake and thereafter Shoemake used his own shotgun as a crutch until he collapsed between the barn and the house.
Next, Thibodeaux's primary witness, Combs, testified inconsistently on three separate occasions as to the time the shooting would have taken place. Testimony from defense witnesses attempting to establish the shooting around 8:00 p.m. was contradicted by their own inconsistencies and by State witnesses who indicated the shooting happened at approximately 7:30 p.m. This fact left unexplained why Shoemake did not reach the hospital until 8:53 p.m., as verified by hospital records.
In addition, Thibodeaux's position that the shooting was accidental was contradicted by the evidence of the State's firearms expert, Allen. Allen stated the gun had no mechanical problems. Allen stated the gun would only fire twice if the trigger were pulled twice; Thibodeaux's rifle was fired twice and as Shoemake suffered only one entrance wound, it appears the first shot missed him, whereupon a second shot was fired which proved to be fatal. The State's proof indicated Shoemake's shotgun was fired once. This raises another question as argued by the prosecutor  Did Thibodeaux, after seeing and/or hearing Shoemake's gun fire at or toward him, actually approach and assist Shoemake, as he claimed? The jury could have reasonably concluded that he did not *169 assist Shoemake up the hill as he claimed, but simply fled the scene and returned to Combs' house, subsequently returning with Combs to take Shoemake to the hospital.
As this Court stated in Buchanan v. State, 567 So.2d 194 (Miss. 1990):
Defendants have often cited and argued application of the Weathersby Rule, but seldom have they prevailed. Usually, a factual issue is presented which requires submission of the case to the jury.
Id. at 196.
In this case, Thibodeaux's argument that he could only be guilty of excusable homicide according to his version of the shooting fails. His actions demonstrated that he could not apply his case to any part of the definition of that offense. See Miss. Code Ann. § 97-3-17. The jury was properly left to resolve all of these factual matters and the Weathersby Rule offers no assistance to Thibodeaux. Since his version of events does not bring the shooting into the legal definition of an excusable homicide, this assignment is without merit.
The remainder of Thibodeaux's argument here, Issue 2, subparts (b) and (c) are equally without merit. Thibodeaux again asserts the Weathersby Rule in stating that his interviews by a psychiatrist while under the influence of sodium amytal and hypnosis also would have "conclusively proved Thibodeaux was telling the truth"  that the shooting was an accident.
Issues 4 and 5 also address the interviews of Thibodeaux and the psychiatrist's proposed testimony. Since the latter assignments address whether the trial court erred in ruling that neither interview nor the related expert testimony could be introduced into evidence at Thibodeaux's trial, these assignments are the ones with which this Court is concerned. The State correctly notes that videotapes and related testimony were not allowed into evidence. Accordingly, we agree that "those matters simply play no part in the consideration of a Weathersby issue."
Issues 4 and 5 are presented as follows:
4. WHETHER THE COURT ERRED IN NOT ALLOWING THE VIDEOTAPE OF THE SODIUM AMYTAL INTERVIEW OF THE APPELLANT/DEFENDANT, JOSEPH THIBODEAUX, JR., BY THE PSYCHIATRIST, DR. CARMEN PALAZZO, INTO EVIDENCE.
5. WHETHER THE COURT ERRED IN NOT ALLOWING THE INTRODUCTION INTO EVIDENCE OF THE APPELLANT/DEFENDANT BEING EXAMINED UNDER HYPNOSIS BY DR. CARMEN PALAZZO UNDER THE GUIDELINES OF House v. State, supra.

This is the crux of Thibodeaux's brief. Thibodeaux argues "had the lower court allowed the introductions of the two tapes in question and the testimony of Dr. Carmen Palazzo as shown in the proffer of testimony, the jury would have had the benefit of this expert witness and this proof that would have proven the fact that Joseph Thibodeaux, Jr. was not guilty of murder, and that this was merely an accident." Further, he asserts, the use of sodium amytal "has reached the stage of reliability, that when properly administered by a competent psychiatrist such as Dr. Carmen Palazzo, the same should be allowed." Thibodeaux relies primarily on the case of House v. State, 445 So.2d 815 (Miss. 1984).
In House, this Court addressed first impression the "use in aid of a criminal prosecution of testimony adduced through hypnosis." Id. at 817. The Court held:
For the reasons described below, we hold that the hypnotist [psychiatrist] may not testify as to facts constituting the crime told him by the victim during a hypnotic session, nor may he offer an expert opinion that the victim is telling the truth. Because the hypnotically refreshed memory of the victim is susceptible of having been "contaminated" during the hypnotic session, her testimony becomes admissible only after certain safeguards set forth below have been complied with.
Id.
In a detailed review of the use of hypnosis and its role, if any, in the courtroom, this Court considered the hypnotist's testimony *170 regarding the facts as told him by the victim, the hypnotist's expert opinion that the victim was telling the truth, and the victim's own testimony, hypnotically refreshed. The Court determined the hypnotist's testimony was essentially inadmissible hearsay, and "nothing more than an improper bolstering of the testimony of the prosecuting witness... ." Id. at 822. Finally, the House Court approved a list of mandatory "minimum safeguards" to be met, coupled with the requirement that a trial judge conduct a hearing, in advance of any testimony by the hypnotized witness, being received, to determine their compliance. Id. at 826-27. Even then, the Court noted that traditional considerations of probative value versus unfair prejudice should also be undertaken by the trial court.
In determining whether to allow the jury to view the videotape of Thibodeaux being interviewed while hypnotized, the lower court opined:
Before scientific procedures and expert opinions can be given, under Rule 702 there must be a field of expertise in which one has been scientifically established that due investigation and study in conformity with techniques and practices generally accepted within the field will produce a valid opinion. The Court in House versus State, (cite omitted), dealt specifically with the idea of hypnotism... . On page 822, the Supreme Court said, whatever value hypnosis may have as an investigative aid, it is our view that at this time that it does not have the status as a science whose practitioners are capable of giving opinions regarding the truthfulness of their subjects with that high degree of validity that we demand of expert witnesses generally. Therefore, what the Court is saying is they don't  hypnosis has not reached that degree of certainty that would allow an expert opinion as to whether or not someone was telling the truth or not.
For that reason, the Court is not going to admit into evidence the hypnotic interview to be played in front of the jury.
It is clear that Thibodeaux incorrectly construes House as supporting his contention that the videotape itself and the hypnotist's resulting expert opinion that Thibodeaux was telling the truth should have been admissible. As to the videotape itself, we hold that the trial court was correct in disallowing it since the defendant was testifying in his own defense without objection from the State. The trial court noted, "The State, as I understand it, is making no objection to the defendant to [sic] testify at trial, if he so desires." Thus, the court reasoned, "So, whether the eight steps were followed in conducting the hypnotic interview are moot since the State is not going to object."
The trial court correctly disallowed the viewing of the videotaped hypnotic interview of Thibodeaux for two reasons. First, this Court in House noted hypnosis has been suggested to be "a state of heightened suggestibility and altered consciousness with `distortions of reality' and `false memories' likely to result." Id. at 823. Second, since the defendant was present and able to testify to his version of the shooting in person before the jury, there was no reason why the videotape should be viewed either in addition to or in lieu of the defendant's live testimony. Further, the videotape was being offered to prove the truth of the matter asserted  that Thibodeaux accidently shot Shoemake to death. It does not qualify as a "prior statement of a witness" under Rule 801 of the Mississippi Rules of Evidence, and does not satisfy any hearsay exception. See M.R.E. Rule 804. Although counsel does not address this problem, the videotape of Thibodeaux's "recollection" of the event was therefore properly excluded.
Counsel also argues that the hypnotist, Dr. Palazzo, should have been able to give her expert opinion that Thibodeaux's recollection, given to her during the hypnotic interview, was the truth. House is again cited in support. What Thibodeaux apparently fails to grasp or ignores was the ultimate holding concerning testimony of a hypnotist, reached by this Court in that case:
Whatever value hypnosis may have as an investigative aid, it is our view at this time that it does not have the status as a science whose practitioners are capable of giving opinions regarding the truthfulness of their subjects with that high degree of *171 validity that we demand of expert witnesses generally.
445 So.2d at 822.
As to proposed testimony of a witness who had undergone hypnosis, in this case Thibodeaux, the Court concluded that "before testimony from the hypnotically refreshed memory may be admitted, there must have been compliance with certain safeguards." Id. at 824. In the case at bar, the trial court determined that Thibodeaux was competent to testify, and there was no objection from the State. There is no merit to this issue.
Separately considering a case of first impression concerning the interview of Thibodeaux performed under the influence of sodium amytal, the "truth serum," counsel cites other support, all cases from Ohio. They avail Thibodeaux little. This Court, for the same reasons that we rejected both the videotaped interview and the hypnotist's opinion of truthfulness following hypnosis, holds that the same evidence was also properly held inadmissible by the trial court where the sodium amytal was administered to Thibodeaux. The cases Thibodeaux cites from Ohio basically held that where sodium amytal was used on a testifying witness, it should be administered under the guidelines used for hypnosis, similar to those Mississippi set forth in House. Again, this is not helpful here, where the State had no objection to Thibodeaux testifying, and he did so testify.
In conclusion of these issues, the trial court did not err in finding the videotaped interviews could not be viewed by the jury, or in disallowing the testimony of Dr. Palazzo concerning her expert opinion that Thibodeaux was telling the truth when interviewed. House does not hold to the contrary and is, for the most part, inapplicable to the facts of this case. These assignments are without merit.

3. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE TO USE THE CONVICTION OF THE APPELLANT/DEFENDANT'S WITNESS, GUNSMITH JOHN TERRY, OF FALSIFYING RECORDS WHEN YOUR APPELLANT/DEFENDANT HAD FILED A MOTION WITH THE COURT REQUIRING THE STATE TO PRODUCE ALL SUCH TESTIMONY; AND THE STATE HAD DELIBERATELY CONCEALED SAID TESTIMONY. YOUR APPELLANT/DEFENDANT DID NOT KNOW OF THE CONVICTION OF THE GUNSMITH.

6. WHETHER THE COURT ERRED IN OVERRULING APPELLANT/DEFENDANT'S MOTION TO CONDUCT IN CAMERA INSPECTION OF THE DISTRICT ATTORNEY'S FILE WHICH WOULD HAVE REVEALED THAT THE DISTRICT ATTORNEY WAS CONCEALING THE FACT THAT THE APPELLANT/DEFENDANT'S GUNSMITH WITNESS HAD BEEN CONVICTED IN ALABAMA OF FALSIFYING GUN SALE RECORDS. THE GUNSMITH HAD BEEN HIRED TO SHOW THAT THE GUN IN QUESTION WOULD SHOOT AS THE APPELLANT/DEFENDANT HAD TESTIFIED IT WOULD SHOOT. THIS WAS VERY PREJUDICIAL TO THE APPELLANT/DEFENDANT'S CASE TO SURPRISE THE APPELLANT/DEFENDANT WITH THE FACT THAT HIS EXPERT WITNESS ON GUNS HAD BEEN CONVICTED OF ALTERING GUNSMITH RECORDS.
These assignments are addressed together as they involve the same facts. Citing Rule 4.06 of the Unif.Crim. Rules of Cir.Ct. Practice, Thibodeaux asserts it was error for the trial court to allow the State to cross-examine the defense's expert gunsmith on his prior conviction for falsifying records, and in overruling the defense's motion to inspect the District Attorney's files to prove they were aware of and concealed the gunsmith's prior conviction.
The complained of cross-examination of witness John Terry, the defense's gunsmith, occurred as follows:
Q. Mr. Terry, you are here testifying under oath; is that correct?
A. Yes, sir.

*172 Q. Well, let me ask you this just very plainly. Have you ever been convicted of a crime of falseness, Mr. Terry?
A. I have.
Q. The fact of the matter is, Mr. Terry, you were convicted in the United States District Court for the Northern District of Alabama, Northeastern Division, in the cause of United States versus John Terry, cause number CR-91-H-133-Northeast, for knowingly causing a licensed firearm dealer to make false entries in records to be kept pursuant to the United States Code; isn't that right?
A. Yes, sir.
Q. And right now you are on probation, aren't you, Mr. Terry?
* * * * * *
Q. You want this Jury to believe your testimony when the fact of the matter is you have been convicted in the United States District Court of getting somebody to make false statements; is that right? Is it?
A. Yes, sir.
During the entire relevant cross-examination of witness Terry, defense counsel made no objections. For this reason alone, the court cannot be said to have erred in permitting the questions asked of Terry. "This Court has repeatedly held that `[i]f no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case.'" Foster v. State, 639 So.2d. 1263 (Miss. 1994); Cole v. State, 525 So.2d 365, 369 (Miss. 1987), cert. denied, 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988).
Thibodeaux also complains that despite a defense motion for the State to "list the witnesses and any records of convictions that the State might have," the lower court erred by allowing the State to "ambush the Appellant/Defendant's witness with the record of conviction of altering the gunsmith records." Counsel complains the fact of the witness's conviction was a surprise to the defense, very prejudicial, and was cause for a mistrial. Only Rule 4.06  Discovery of the Criminal Rules of Circuit Court Practice, is cited in support. Rule 4.06, in part relevant to counsel's argument, provides:
(a) Upon written request by the defendant, the prosecution shall disclose to each defendant or to his or her attorney, and permit him or her to inspect, copy, ... the following which is in the possession custody, or control of the State, or the existence of which is known, or by the exercise of due diligence may become known, to the prosecution:
(1) Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial, together with a copy of the contents of any statement... of each such witness and the substance of any oral statement made by any such witness;
(6) Any exculpatory material concerning defendant.
In a very loose interpretation of the rule, Thibodeaux writes: "Rule 4.06 ... provides that the State must furnish the Defendant all evidence that it intends to use against the Defendant." Further, in Thibodeaux's Motion for New Trial it is written:
(6) The Court erred in allowing the State to use the conviction of John Terry in cross examining the said John Terry because the Defendant had filed with the State a written request of discovery under Rule 406 [sic] and under Rule 406 [sic] (a)(6) the State was required to furnish any exculpatory material concerning the Defendant which would have included the conviction of John Terry. The testimony shows that the said John Terry had not advised the Defendant's counsel that he had been convicted of falsifying records, and had he advised your Defendant's counsel, or had the State provided defense counsel with the exculpatory material, your Defendant would not have placed John Terry on the stand and would have used other gun experts; and, therefore, your Defendant is entitled to a new trial because of the violations of the rules of discovery on the part of the State... .
A plain reading of Rule 4.06(a)(1) reveals that the list the State was required to furnish the defense was that of the State's witnesses proposed to be used at trial. *173 This list was required in response to the defense's Motion for List of Witnesses and Record of Convictions, If any, of Witnesses. The lower court sustained in part and denied in part the motion. The State was required to list its witnesses, but was not required to provide any criminal records or convictions of said witnesses. Nothing in Rule 4.06 or the order pertained to the defense's own witnesses.
Further, counsel's argument that the conviction of Witness Terry was "exculpatory material" is simply wrong. The State's attempt to impeach the witness through use of his conviction for falsifying records in no way exculpates Thibodeaux. Actually, the conviction of Terry for causing firearms records to be falsified was particularly relevant and admissible. Rule 609(a)(2) of the Mississippi Rules of Evidence provides "[f]or the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime ... (2) involved dishonesty or false statement, regardless of the punishment."
The comment to Rule 609(a)(2) reads: "The admission of prior convictions involving dishonesty or false statement is not within the discretion of the court. Such convictions are peculiarly probative of credibility and are always to be admitted." (emphasis added).
In sum, the fact that the witness was properly impeached through the use of his conviction for a crime of falseness amounts to no erroneous ruling of the lower court and no improper failure to provide discovery by the State. It would appear that basically, the witness failed to disclose his conviction to the defense counsel who hired him, and the defense counsel apparently failed to properly investigate his "expert." Other than Rule 4.06 which fails to support his position, Thibodeaux cites no caselaw or other support.
Issue 6 concerns the same circumstances, but here Thibodeaux alleges a search of the District Attorney's files would have revealed the plot to ambush the defense by springing the conviction of Witness Terry on them. No support is provided for this assignment. Even had the defense proved the record of conviction was in the possession of the D.A.'s office, there is nothing which required the information to be turned over to the defense.
This assignment is without merit.

CONCLUSION
This case vividly illustrates the dangers to which conservation officers may be subjected when investigating hunting violations such as headlighting deer. The proof showed that the area on Jimmy Combs' place where the shooting occurred was clearly designated for deer hunting. There was a tree stand, a shooting house, rye grass fields, corn out in the fields, and a mineral block. Shoemake went to Combs' place, "to see if Thibodeaux was headlighting deer." Thibodeaux's testimony bounced back and forth as to whether he was illegally headlighting deer, yet his own statements admitted that earlier that day he had hunted deer at Combs' shoot house until about 6:00 p.m. Testimony established that the time of sunset on December 26th was 5:03 p.m. Thus, legal deer hunting hours ended at 5:33 p.m. Thibodeaux clearly admitted to headlighting deer later that night. His statement read that he was "headed back to the stand ... to see if I could shine a deer ... everybody told me it was easy to see deer at night... . This was my first time to hunt at night." Thibodeaux finally admitted on cross-examination: "I guess I would have to say I was hunting... . Yes, I guess I went up to hunt. Yes, sir ... Nervous, because I was illegally hunting." The prosecutor asked, "You were illegally hunting deer and you killed a man?" Thibodeaux replied, "Yes, sir." Thibodeaux was clearly headlighting deer illegally, using a .270 rifle, a deadly weapon and killed Shoemake in the process. Thibodeaux did not claim heat of passion as a defense.
Thibodeaux's claim that this incident was nothing more than an accidental shooting which often occurs while hunting was resolved by the jury's verdict against Thibodeaux, finding him guilty of murder. This Court's thorough review of all the alleged reversible errors argued by Thibodeaux shows each one is without merit.
*174 The Weathersby rule does not apply so that a verdict of acquittal should have been directed. Thibodeaux's contention that he was only guilty of an excusable homicide is refuted when the definition of that offense is considered. See Miss. Code Ann. § 97-3-17. Additionally, many physical facts and circumstances contradict or fail to support Thibodeaux's description of the shooting and alleged assisting of Shoemake from the scene to the barn. The real issue is whether the shooting was accidental or deliberate. Thibodeaux's initial decision to pull the trigger of the .270 rifle and firing at a human voice that was shining a light was critical for the jury's determination of the issue. In order for the killing of Shoemake to be excusable by accident or misfortune, Thibodeaux had to be doing a lawful act by lawful means without a deadly weapon involved. The lower court properly ruled that the issue should be determined by the jury. The jury was instructed adequately on capital murder, murder, manslaughter, and excusable homicide. There was no error in the jury verdict that Thibodeaux was guilty of murder.
The conviction for falsifying records of the defense's witness John Terry, a gunsmith, was properly used by the State to impeach him. See M.R.E. 609(a)(2). Thibodeaux failed to object at trial. Were the defense's request to inspect the District Attorney's files to prove the D.A. was aware of the conviction prior to trial granted, and such fact proved, it would not have changed the outcome under the rules of discovery. Nothing required the prosecution to apprise the defense of this fact. Terry was a defense witness, and as such, it was left to the defense to investigate him.
Thibodeaux's primary focus on appeal to this Court concerns the interviews of Thibodeaux while he was under the influence of hypnosis or sodium amytal. Thibodeaux, citing House, repeatedly takes the position that his version of the shooting was "proven" to be truthful by these interviews and the psychiatrist's opinion that he was indeed telling the truth. Thibodeaux simply misconstrues and misapplies this Court's decision in House, which included that a psychiatrist certainly may not give an expert opinion that a hypnotized witness was telling the truth during a session, as the field is not recognized as a reliable science and since the opinion would be nothing more than "improper bolstering."
Second, Thibodeaux expends considerable effort to describe the guidelines set forth by this Court in House which must be complied with prior to a witness testifying with hypnotically refreshed memory. The problem with Thibodeaux's argument is that the State never objected to Thibodeaux's testifying in his own defense and Thibodeaux did in fact testify. Compliance with the safeguards established in House would only have assured Thibodeaux's ability to testify.
So goes the analogy on the first impression issue as to the interview of Thibodeaux while under the influence of sodium amytal. For the same reasons discussed in House, Dr. Palazzo would not be permitted to give her opinion that Thibodeaux was being truthful in recalling how the shooting took place. The argument that the House guidelines should also apply to testimony of a witness who underwent an interview where sodium amytal was administered, if successful, would be of no benefit to Thibodeaux. Again, compliance with the House safeguards would help guarantee that a person was competent to testify at trial, as Thibodeaux did in this case, and nothing more.
Having thoroughly reviewed Thibodeaux's supported assignments of error, we find no reversible error indicated. His conviction and sentence of life in the custody of the Mississippi Department of Corrections is affirmed.
CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN, BANKS and JAMES L. ROBERTS, Jr. JJ., concur.
DAN M. LEE, P.J., and McRAE, J., concur in result only.